**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**December 18, 2013**

**FOR THE TENTH CIRCUIT**

_____

SCOTT A. BLUM; AUDREY R. BLUM,

     Petitioners - Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE,

     Respondent - Appellee.

No. 12-9005

_____

**APPEAL FROM THE UNITED STATES TAX COURT**
**(NO. 2679-06)**
_____

Christopher Reimer of Long Reimer Winegar Beppler, LLP, Jackson, Wyoming, for
Appellants.

Judith Hagley of the U.S. Department of Justice, Tax Division, Appellate Section,
(Kathryn Keneally, Assistant Attorney General; Tamara W. Ashford, Deputy Assistant
Attorney General; Gilbert S. Rothenberg, Attorney; Richard Farber, Attorney,
Department of Justice, with her on the brief) Washington, DC, for Appellee.

_____

Before **HARTZ** and **TYMKOVICH,** Circuit Judges, and **JACKSON**[*]**,** District Judge.

_____

**JACKSON,** District Judge.

_____

_____

[*]The Honorable R. Brooke Jackson, United States District Judge for the District of
Colorado, sitting by designation.

## I.    Introduction

This case comes to us on appeal from a decision of the Tax Court upholding the actions of the Commissioner of the Internal Revenue Service (IRS) invalidating a financial transaction as lacking economic substance and imposing two accuracy-related penalties for underpayment of taxes.  We have jurisdiction to hear this appeal under I.R.C. § 7482(a)(1).  The intricacies of this offshore financial transaction and the fog of plausible deniability surrounding it cannot make up for the clarity of the big picture: this was a transaction designed to produce nothing more than tax advantages, and the Tax Court was right to uphold the Commissioner's actions.

## II.    Facts

The taxpayer in question, Mr. Blum, is a successful businessman who founded Buy.com.  In response to Mr. Blum's 1998 and 1999 federal income tax returns, the Commissioner of the IRS issued a notice of deficiency and penalties against Mr. Blum.[1]  Mr. Blum challenged that notice in the Tax Court.  He lost and subsequently appealed the ruling to this Court.

Mr. Blum's briefs describe a "hard-working and self-made business owner."  Indeed, Mr. Blum's accomplishments are numerous and impressive.  Mr. Blum founded Buy.com which in 1998 set records as the fastest growing company in U.S. history.  This achievement undoubtedly springs from Mr. Blum's drive and business acumen.  Mr. Blum's success, it should be noted, was not necessarily the result of formal education or

---

[1] Mr. and Mrs. Blum jointly filed the tax returns at issue in this appeal, and therefore Mrs. Blum is also a party to this lawsuit.  For simplicity's sake, this opinion refers only to Mr. Blum.

expertise. As he points out in his brief, he never graduated from college, nor does he have special expertise in the areas of federal income tax law, accounting, or stock market investment. Rather he is a business development expert, and he generally relies on others to counsel him on matters like tax and investment.

In 1996, Mr. Blum retained KPMG for accounting services. Mr. Blum's father vouched for the firm's reputation, and Mr. Blum has relied on them for years. He has also hired former KPMG employees. It was, by all accounts, a good and fruitful relationship.

In August 1998, Mr. Blum made two sales of Buy.com stock resulting in $45 million in capital gains. A KPMG accountant who previously worked on Mr. Blum's tax returns was aware of Mr. Blum's possible capital gains and referred him to Carl Hasting of KPMG's Capital-Transaction Group. Mr. Hasting met with Mr. Blum twice. At these meetings, Mr. Hasting pitched a transaction called OPIS (Offshore Portfolio Investment Strategy) to Mr. Blum. The transaction, it is now widely acknowledged, is a tax shelter. However, KPMG recommended the transaction to Mr. Blum before IRS and Congressional investigations revealed this information to the public. Mr. Blum claims he saw an investment opportunity; the Commissioner claims Mr. Blum saw a tax evasion opportunity.

At this point, a brief overview of the OPIS transaction will be helpful. The OPIS shelter is designed to create large, artificial losses for taxpayers by allowing them to claim a large basis in certain assets. These artificial losses offset actual capital gains, reducing the tax liability of the participating taxpayer. A basis is, to oversimplify, the

3

capital cost of an asset. *IRS Topic 703 – Basis of Assets*, *available at*

www.irs.gov/taxtopics/tc703.html (last visited Oct. 16, 2013). There are technical rules

that allow certain related parties in a financial transaction to claim a basis that, in reality,

does not reflect the amount that the party paid for the asset. In fact, the party might not

have actually purchased the asset at all. OPIS took advantage of this technical rule to

allow clients to pay a relatively small amount of money in order to claim a

disproportionately large basis and to use that basis to shelter their own otherwise taxable

income. *See generally* Staff of S. Comm. on Gov't Affairs, Permanent Subcomm. on

Investigations, 108th Cong., Rep. on U.S. Tax Shelter Industry 5-10, 28 (Comm. Print

2003) [hereinafter Senate Report].

Individual components of this transaction presented the possibility of profit. No

one, however, argues that profits were likely. Indeed, while the parties dispute the

method used to calculate the likelihood of profit, both agree profits were unlikely.

Rather, according to Mr. Blum, the small chance of huge profits justified the risk of such

an investment.

According to Mr. Blum, he never discussed the tax effects of the transaction with

Mr. Hasting. Tr. 65-66.[2] He also cannot remember discussing OPIS with any of his

other advisors. Nevertheless, after a second meeting with Mr. Hasting, Mr. Blum signed

an Engagement Letter with KPMG that indicated KPMG would receive a fee of $687,500

---

[2] We use the abbreviations used by the parties to refer to materials in the record: Tr. (to refer to the tax court transcript); Op. (to refer to the tax court opinion); and Ex. (to refer to exhibits in the trial court).

in exchange for serving as a tax advisor to Mr. Blum on the OPIS transaction. Ex. 12-J. Mr. Blum does not recall reading this engagement letter.

It appears that Mr. Blum left the management of his OPIS investments to KPMG. As a result, he claimed $45 million in losses on his 1998 income tax returns. Mr. Blum filed those returns on April 15, 1999. The next month, KPMG provided Mr. Blum with an opinion letter that explained the legal justification for these financial transactions and concluded that the IRS would "more likely than not" view the transactions as legitimate. Ex. 98-P.

These sorts of basis-shifting transactions caught the IRS's attention in 2001. According to the GAO, abusive tax shelters may have deprived the U.S. Treasury of between $11 and $15 billion per year during the 1990s. Sen. Rep. at 20. Extensive investigation by the IRS and U.S. Senate revealed a widespread practice of using basis-shifting to create paper losses for clients, thereby reducing their tax bills. The investigation revealed that even within KPMG there was concern about the potential illegality of these transactions. One memorandum went so far as to call the economic substance of these deals "smoke and mirrors." *Id.* at 41. The Senate Report concluded that KPMG might have bullied or misled clients into signing off on certain factual representations underlying the transactions. For example, the Senate Report observes that in certain cases "KPMG alone, apparently without any client input, wrote the client's representations and then demanded that each client attest to them by returning a signed letter to the accounting firm." *Id.* at 68.

5

The IRS formally disallowed OPIS and similar transactions in 2001.  I.R.S. Notice 2001-45, 2001-2 C.B. 129.  Rather than individually prosecute each OPIS scheme, the IRS settled with over 90 percent of OPIS purchasers in 2003.  Johnson, *Tales from the KPMG Skunk Works: The Basis-Shift or Defective-Redemption Shelter*, Tax Notes 431, 433-34 (July 25, 2005).  Mr. Blum did not accept the settlement offer.

These revelations occurred after Mr. Blum participated in OPIS.  Nonetheless, in 2005, the IRS sent a deficiency notice to Mr. Blum regarding his 1998 and 1999 federal income tax returns.  This notice disallowed the losses Mr. Blum claimed in connection with OPIS, and it imposed penalties for a gross valuation misstatement (I.R.C. § 6662(h)) and negligent underpayment (I.R.C. § 6662(b)).  Mr. Blum challenged this notice in the Tax Court in February 2006.  The Tax Court rejected his challenge, concluding that the Commissioner was correct to disallow the claimed losses under the economic substance doctrine, and that both the gross undervaluation and negligence penalties were appropriate.

Mr. Blum also filed a civil case against KPMG for fraudulent misrepresentation in the Central District of California in 2011.  After the Tax Court approved the negligent underpayment penalty, the District Court ruled that such a finding collaterally estopped Mr. Blum from arguing that he relied on KPMG's advice that OPIS was a legitimate investment strategy.  *Blum v. KPMG, LLP*, No. SACV 11-01885-CJC (C.D. Cal. July 17, 2012) (Order).

In his appeal to this Court, Mr. Blum makes three arguments: (1) that the Tax Court erred when it disallowed the OPIS losses under the economic substance rule; (2)

6

that the Tax Court erred by imposing a penalty for a gross valuation misstatement after it concluded the underlying transaction lacked economic substance; and (3) that the Tax Court erred by imposing penalties for negligent underpayment, because Blum relied in good faith on KPMG's representations. The Commissioner continues to maintain that the transaction lacked economic substance, and that the gross valuation misstatement and negligence penalties are warranted.

We affirm the opinion of the Tax Court and note that the question of whether Mr. Blum is collaterally estopped from arguing that he reasonably relied on KPMG's advice in good faith is not before this Court.

### III.   Discussion

A. <u>Disallowance of OPIS Losses</u>

Quixotically, Blum maintains that the OPIS transaction presented a reasonable probability of generating a profit. It follows, he argues, that the Commissioner was wrong to disallow the losses he claimed as a result of the transaction, and the Tax Court was wrong to validate the Commissioner's action. In a nutshell, Mr. Blum argues that the Tax Court applied the wrong test to determine whether the transaction lacked economic substance, that it improperly ignored the testimony of one of two dueling expert witnesses, and that it committed clear error by finding that Mr. Blum lacked the subjective motivation to generate a profit from OPIS.

We are unconvinced and find ourselves arriving at the same conclusion arrived at by the IRS, the U.S. Senate Committee on Governmental Affairs, and the Tax Court. The

7

OPIS transaction in this case was a sham designed to reduce Mr. Blum's tax liability, and it lacked any reasonable probability of generating a profit.

We review de novo the tax court's "general characterization of a transaction for tax purposes." *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978). The facts underlying that characterization, however, are subject to clear error review. *Id.*

    i.      *Law to Apply*

In the Tenth Circuit, the economic substance doctrine dictates whether the Commissioner may rightfully disregard a transaction as lacking economic substance. *Sala v. United States*, 613 F.3d 1249 (10th Cir. 2010); *Keeler v. Comm'r*, 243 F.3d 1212 (10th Cir. 2001); *Jackson v. Comm'r*, 966 F.2d 598 (10th Cir. 1992); *James v. Comm'r*, 899 F.2d 905 (10th Cir. 1990); *see also Casebeer v. Comm'r*, 909 F.2d 1360, 1365 (9th Cir. 1990) (holding that courts must disregard transactions that are designed to comply with the literal terms of the tax code but are unlikely to produce non-tax economic benefits). The doctrinal framework is fairly straightforward. Courts must ask two questions: (1) what was the taxpayer's "subjective business motivation," and (2) did the transaction have objective economic substance? *Jackson*, 966 F.2d at 601.

Things get a little muddled when courts attempt to flesh out the answers to these two questions. Just how much weight should each prong get? How, exactly, should a court determine whether a transaction possessed objective economic substance?

Mr. Blum argues that the answers to these questions are different today than they were before 1998. He contends that pre-1998 cases such as *Jackson* and *James* used a "unitary test" for economic substance. He further contends that this unitary test is

narrower than the post-1998 cases. As best we can tell, his core theory here is that a so-called unitary test would put more weight on the possibility of profit in any given transaction and less weight on the subjective motivation for entering the transaction. Later cases like *Sala* and *Keeler*, by contrast, "minimiz[e] the relevance of [a transaction's] objective profit potential and requir[e] that tax advantages be linked to actual losses." Appellant Br. 24. Therefore, he concludes, it would be unfair to rely on these later cases when he and other taxpayers in 1998 were operating under the unitary test—in Mr. Blum's eyes a more lenient standard because it does not concern itself as much with evidence of a subjective motivation to avoid taxes so long as the transaction presents *some* possibility of profit.

We find no such division between pre- and post-1998 cases. Indeed, the "unitary test" relied on by Mr. Blum is not a codified doctrine in its own right, but rather a divergence from Fourth Circuit precedent in *James* and a recognition of the common sense approach adopted by this circuit. The Fourth Circuit utilizes a two-prong approach requiring a court to find "[1] that the taxpayer was motivated by no business purposes other than obtaining tax benefits . . . and [2] that the transaction has no economic substance because no reasonable possibility of profit exists." *James*, 899 F.2d at 908-09 (citing *Rice's Toyota World, Inc. v. Comm'r*, 81 T.C. 184, 202-03 & n.17, 209 (1983), *aff'd in part, rev'd in part on other grounds*, 752 F.2d 89 (4th Cir. 1985). Our approach holds that these two factors, rather than being independent prerequisites to finding an absence of economic substance, are simply "more precise factors to consider" in that

9

analysis. *James*, 899 F.2d at 908-09 (citing *Sochin v. Comm'r*, 843 F.2d 351, 354 (9th Cir.), *cert. denied*, 488 U.S. 824 (1988).

The unitary test from *James* is hardly different from the analysis applied in *Sala*. To be sure, something did change between those two cases. The *Keeler* court held that tax advantages must be linked to actual losses. And, it is true that a taxpayer in 1998 could have scoured the legal tomes without finding an explicit enunciation of this idea. However, such an idea is not novel. In fact it is a rather obvious extension of the underlying doctrine. For many decades, cases have identified the artificiality of a transaction as one of the most important factors to consider when evaluating economic substance. *See Shoenberg v. Comm'r*, 77 F.2d 446, 449 (8th Cir. 1935). A transaction that produced enormous tax savings without concomitant losses would have triggered red flags under pre-*Keeler* case law. It would have smacked of a too-good-to-be-true transaction, and it would have been a "transaction[] lacking an appreciable effect, other than tax reduction." *James*, 899 F.2d at 908. In other words, the applicable case law has changed—if at all—only in minor, predictable ways, none of which would have changed the outcome of Mr. Blum's case.

Mr. Blum does not dispute, apparently, that an economic substance analysis requires the Tax Court to look at subjective motivation and objective profit potential. He simply believes it is reversible error for the Tax Court to explain its reasoning under those two broad factors. We find this argument counter-intuitive at best.

The Tax Court engaged in precisely the detailed factual analysis required under *Jackson*, *Keeler*, and *Sala*. It was appropriate for the court to consider such things as the

10

artificiality of the loss, the close connection between the loss and the purportedly sheltered capital gains, Mr. Blum's apparent failure to investigate the economics of the transaction, the pre-planned design of the transaction, and the disparity between the transaction's profit potential and tax benefits. The Tax Court, to put it another way, showed its work. We cannot find error in its decision to enumerate the facts that support its conclusion.

We do not need to address Mr. Blum's arguments about retroactivity because, as we have just explained, there is no appreciable difference between the economic substance doctrine as it existed in 1998 and the doctrine applied by the Tax Court in this case.

In a field as intricate and ingenious as the tax shelter industry, it makes good sense to let courts weigh relevant factors to determine the underlying character of a challenged transaction. To do otherwise would unnecessarily tie the hands of the IRS and the Tax Courts in their ongoing adaptation to new schemes. The Tax Court identified the correct test for economic substance, Mr. Blum's arguments about changing precedent notwithstanding. We therefore turn our attention to whether the Tax Court correctly applied this test to Mr. Blum's participation in OPIS and the resulting losses he claimed on his federal income tax returns.

ii.     _Objective Economic Substance_

Mr. Blum argues that the evidence before the Tax Court established that his OPIS investment offered a reasonable possibility of generating a profit. In the face of substantial evidence indicating that the transaction was a sham, Mr. Blum is essentially

11

arguing that the Tax Court should have believed his expert instead of the government's expert, and that his expert's testimony leads to the inexorable conclusion that the OPIS transaction presented a substantial likelihood of generating a profit. We disagree.

To reach the conclusion that the OPIS transaction lacked objective economic substance, the Tax Court made four relevant factual findings. First, it noted that the $45 million loss associated with the transaction was grossly disproportionate to the $6 million Mr. Blum invested in OPIS. Moreover, Mr. Blum did not lose $45 million. The loss was fictional and did not have any real world effect on Mr. Blum's pocketbook. Mr. Blum does not dispute this.

Second, the Tax Court noted that the OPIS transaction was planned and executed in a way that was designed to generate the loss. Evidence that a transaction was designed to "produce a massive tax loss" indicates the transaction lacks economic substance. *Sala*, 613 F.3d at 1255. UBS, the bank involved in the OPIS transaction, understood that the "essence of the [OPIS] trade" was to create a tax loss. This explains, in part, why the transaction's stock purchase matched the desired amount of capital loss. It also explains why the deal included an options collar. By limiting the potential for huge gains and losses, KPMG was able to retain absolute control over the transaction and ensure that UBS "retained almost all of the economic benefit." Appellee Br. 43; *see Dow Chem. Co. v. United States*, 435 F.3d 594, 603-604 (6th Cir. 2006) (finding that a transaction lacked economic substance where a practical possibility for gain also "contained features designed to neutralize the taxpayer's ability to realize [those] gains"). The desire to generate a loss also explains the timing of the various elements of the transaction. As the

12

government points out, both the sale of the UBS stock and the expiration of the options were discretionary actions by KPMG that occurred just before the end of the 1998 tax year. All of this would make economic sense if there were some evidence in the record that Blum or KPMG thought this timing was economically advantageous to Mr. Blum. However, the record contains no such evidence.

Third, the Tax Court found that OPIS did not provide a reasonable expectation of profit. One rule of thumb is that a transaction has economic substance if it is "likely to produce economic benefits aside from a tax deduction." *Casebeer*, 909 F.2d at 1365 (citation omitted). The probability of earning a profit must be reasonable, not a mere possibility. *See Stobie Creek Invs., LLC v. United States*, 608 F.3d 1366, 1376 (Fed. Cir. 2010) (requiring a showing that "a prudent investor would have had a reasonable expectation of earning a profit from the transaction) (citing *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1357 (Fed. Cir. 2010)). Here, the parties offered dueling expert opinions. Mr. Blum's expert, Dr. Hodder, admitted that OPIS was unlikely to produce a profit, but concluded that the small possibility of a very large profit made the investment reasonable. Ex. 119; Tr. 200-01, 228-29, 361-62 (noting that Mr. Blum had a "76.3 percent chance of losing money" in OPIS). The government's expert, Dr. Kolbe, agreed that OPIS was unlikely to produce a profit. This fact, coupled with other elements of the transaction—such as overpriced options—led Dr. Kolbe to conclude that the net present value of and expected rate of return on OPIS were both negative. No prudent investor, in other words, would enter into such a transaction based on its non-tax characteristics. The Tax Court weighed the testimony and reasonably decided that Dr. Kolbe's conclusions

13

were more helpful in determining whether the transaction presented a reasonable chance of profitability.

Fourth and finally, the Tax Court, relying on the testimony of both experts, concluded that what profit potential OPIS presented was "de minimis" when compared to the tax benefits of declaring capital losses of $45 million. This disparity indicated a lack of economic substance. *See Sala*, 613 F.3d at 1254.

Contrary to Mr. Blum's assertions, the economic substance issue cannot be boiled down to "one overriding consideration [of] whether Blum's OPIS investment had substantial economic effects in the form of a probability of generating a pre-tax profit." Appellant's Reply 6 (citing *James*, 899 F.2d at 908-09). The Eighth Circuit recently reached the same conclusion we do today. *WFC Holdings Corp. v. United States*, 728 F.3d 736, 746 (8th Cir. 2013) (rejecting an effort to justify a similar basis-inflating scheme by "isolat[ing] a kernel of prospective profitability to justify a large, multi-step, multi-property transaction").

Supposing we give Mr. Blum the benefit of the doubt, however, and delve more deeply into the profit potential prong, we still cannot find that the Tax Court erred in reaching the conclusion that OPIS did not present a reasonable probability of pre-tax profit. Mr. Blum makes four arguments within the profit potential prong. Specifically, he asks us to reverse the Tax Court because (1) his expert, Dr. Hodder, testified that each component of the OPIS deal might have generated a profit, (2) that the remote possibility of very large profits justified the deal's high risk, (3) that the government's expert, Dr. Kolbe, used the wrong method to reach his conclusions, and (4) that the Tax Court let

14

evidence about KPMG's subjective motivation for OPIS serve as a substitute for evidence of objective unprofitability.[3]

Mr. Blum's first two arguments are similarly flawed. They ask us to look not at the forest but at the trees. Simply because Dr. Hodder testified that each step of OPIS had economic substance, and that there was an "enormous possible upside" to OPIS, does not mean the overall transaction presented a reasonable chance of turning a profit. Evidence that each step was profitable or that there was a tiny chance of an extremely large profit could theoretically establish a reasonable probability of profitability. However, as the Tax Court observed, "profit potential does not necessarily compel the conclusion the transaction has economic substance. *Sala*, 613 F.3d at 1251-54. Here, the overarching context included the facts that the options were overpriced, and that the UBS stocks would have been more profitable if they had been purchased independently of the OPIS transaction.

Likewise, Mr. Blum's attacks on Dr. Kolbe's methods don't land a punch. It was appropriate for the Tax Court to rely on Dr. Kolbe's testimony about expected rates of return. There is no case law suggesting that "simulations are the only effective way" for the Tax Court to evaluate the profit potential of a given transaction. Appellant Br. 27-28. On the contrary, profit potential can be evaluated in various ways including "examin[ing]

---

[3] At times, Mr. Blum appears to suggest that because he was unaware of the aspects of OPIS that made the transaction unlikely to produce a profit, this Court should conclude that the transaction presented a reasonable likelihood of producing a profit. Mr. Blum's knowledge, however, is irrelevant for purposes of the objective prong. *See, e.g.*, Appellant Reply 9 (arguing that Mr. Blum could not have been aware of alleged overpricing associated with options in the OPIS transaction and suggesting that this lack of awareness indicated an objective profit potential).

15

the probability of each outcome, the expected rate of return, and the price of the options, which are all factors a prudent investor might consider when deciding whether to invest." *Stobie Creek Invs.*, 608 F.3d at 1376. Even Dr. Hodder agreed that the expected rate of return was a "common method of evaluating an investment." Ex. 108 at 61-84, 107. And as the Commissioner points out, Dr. Kolbe in fact used simulations to determine an estimated rate of return. That appears to leave Mr. Blum with an argument that the Tax Court should not have believed Dr. Kolbe because he failed to use the Black-Scholes method and did not perform as many simulations as Dr. Hodder. To describe that argument is to reject it. There is simply nothing in the case law or in common sense that compels us to reverse the Tax Court on this narrow evidentiary issue.

Finally, we turn to the issue of subjective motivation and intent as it relates to objective profit potential. Of all the arguments Mr. Blum raises about the proper application of the objective economic substance analysis, this one gives us the most pause. It probably would be inappropriate for the Tax Court to let the subjective motivations of some of the players overwhelm contrary evidence about profit potential. Fortunately, the Tax Court did not let that happen. Mr. Blum points to a handful of the Tax Court's observations that, in his mind, indicate that the Tax Court neutered the objective prong by interpreting Dr. Hodder's testimony in light of KPMG's and UBS's subjective purposes behind OPIS. *See, e.g.*, Op. 37 ("calculations assume a transaction that was not pre-ordained to create a loss *intended* specifically to offset a particular gain") (emphasis added). This type of reasoning is permissible, however, and does not neuter the objective prong. Indeed, the subjective motivations of parties to a transaction can

16

help put objective evidence into context, especially in a transaction like this one that is embedded with various discretionary tools. That is to say, one party's purportedly objective evidence that a deal could result in profit may be less persuasive if another party offers evidence that the actors could influence the outcome and had a motive to do so. Importantly, the Tax Court did not reference Mr. Blum's subjective motivation in this part of its analysis; it merely looked to the subjective motivation of the parties that structured and executed the transaction to understand better the objective profit potential. Therefore the Tax Court did not err when it reconciled conflicting expert testimony in this way.

### iii. *Subjective Motivation*

Mr. Blum argues that the Commissioner relied on inappropriate evidence under the subjective business motivation prong of the economic substance analysis. He maintains that he participated in OPIS to make a profit, not to reduce his tax liability, and therefore the Tax Court erred in finding that the transaction lacked economic substance.

The Tax Court didn't buy it, and neither do we. Mr. Blum's "actions during and after the OPIS transaction" indicate that his sole motive was tax avoidance. Op. 33. In particular, we note that the timing of the transaction relative to the sale of his stock, his purpose in retaining KPMG, his failure to investigate the deal's economic prospects, and his subsequent description of the transaction in his civil suit against KPMG speak volumes about his intent.

Regarding the timing of the transaction, Mr. Blum claims that he had "already fully committed himself to OPIS" before he sold the Buy.com stock. Appellant Br. 38.

17

The Commissioner counters that Mr. Blum signed the agreement to purchase OPIS on the same day he sold the stock. The back and forth about dates is confusing, to be sure, but it appears that the Commissioner offers a better chronology. The first sale of Buy.com stock occurred before Mr. Blum committed to OPIS. He claims he sold the first $5 million of Buy.com stock on August 18, 1998. Tr. 50, 56, 72-75. Then he began negotiating the second sale of $40 million in late September of 1998. Tr. 61-62. He executed the purchase agreement with his buyer on September 30, 1998. Tr. 76. This was, however, the same day he signed the OPIS agreement. Ex. 13. Therefore, the Tax Court could infer that Mr. Blum entered OPIS with his capital gains tax liability in mind and could disregard as self-serving Mr. Blum's insistence that he was attracted to OPIS for its profit potential and nothing more. That Mr. Blum retained KPMG as a tax advisor rather than an investment advisor further undermines his explanation of events.

Moreover, Mr. Blum did not investigate the deal after hearing Mr. Hasting's promotional pitch. A court may conclude that a transaction lacked a business purpose where the taxpayer demonstrates a disregard for the economic consequences of a transaction. *See Casebeer*, 909 F.2d at 1365 (noting that "failure to consult an attorney and [the taxpayer's] lack of understanding of the transaction, indicated that [he] had no business purpose . . . other than tax avoidance").

In his defense, Mr. Blum insists that he did not understand the details of the transaction and relied on the statements made by KPMG. He believes the Commissioner is punishing him for his lack of understanding and supplanting his motives with KPMG's more nefarious motives. But neither the Commissioner nor the Tax Court faulted Mr.

18

Blum for mere lack of understanding. Rather they took his lack of understanding coupled with demonstrated indifference to remedy that lack of understanding as evidence of his real motive: to shelter his capital gains. As the government notes, Mr. Blum

> admitted that he (i) knew nothing about Alfaside or Benzinger, his counter-parties in the OPIS transaction; (ii) knew nothing about the swap agreement, which purportedly was critical to the investment strategy (Ex. 96) and involved most of the money invested in the transaction (i.e., $2.9 million (Op. 12)); (iii) did not analyze the transaction's economics; (iv) did not ask his financial advisors to analyze the transaction's economics or otherwise evaluate the transaction; (v) decided to participate in the transaction based on two one-hour discussions with his tax advisor; and (vi) did not monitor the transaction.

Appellee Br. 37 (citation omitted). KPMG's engagement letter explicitly warned Mr. Blum that he needed a "reasonable expectation" of profit if OPIS was to withstand IRS scrutiny, and that he ought to "seek independent advice concerning the investment aspects of the proposed transactions." Ex. 12; *cf. Sacks v. Comm'r*, 82 F.3d 918, 920 (9th Cir. 1996) (holding that where promotional materials provided warnings that would have "warranted further investigation by a prudent investor" failure to do so was unreasonable). Mr. Blum did not seek independent advice, and he even neglected to ask his own investment advisors to evaluate the deal.

Mr. Blum counters that "[u]ncontroverted trial testimony indicated that Blum's discussion with KPMG employees focused solely on the OPIS investment's profit potential." Appellant Br. 40. It would be more accurate to say that Mr. Blum offered testimony at trial that he discussed the profit potential but not the tax advantages of OPIS with Mr. Hasting. The Commissioner, however, offered substantial evidence that Mr. Blum entered OPIS with the subjective intent to shelter his taxes. To reiterate some of

19

that evidence, Mr. Blum retained KPMG for tax services, demonstrated disregard for the economic terms of the deal, and decided to participate at approximately the same time that he generated large capital gains by selling his Buy.com stock. While the Commissioner apparently did not contest the trial testimony, this other evidence severely undermines that testimony's worth. The Tax Court was well within its discretion to disregard as self-serving Mr. Blum's testimony regarding his subjective intent.

Finally, the Tax Court relied on statements Mr. Blum has made in his civil case against KPMG to understand his subjective intent. Mr. Blum sued the firm over its "Tax Strategies," claiming that his reliance on KPMG led him to not adopt "other available strategies which would have deferred or minimized tax liability." Ex. 10 at 4. Taken as a whole, the Tax Court had sufficient evidence before it to conclude that Mr. Blum entered the OPIS transaction with no legitimate business purpose and to void the associated losses he claimed on his taxes.

## B. Gross Valuation Misstatement Penalty

The Commissioner also assessed penalties against Mr. Blum for his underpayment of taxes associated with OPIS in 1998. One of these penalties was a gross-valuation misstatement penalty authorized by I.R.C. § 6662. The Tax Court upheld the imposition of the gross-valuation misstatement penalty. Mr. Blum maintains that in doing so, the Tax Court committed reversible error. In particular, he argues that such a penalty is inapplicable where the underlying transaction has been invalidated by the economic substance doctrine. Recognizing that the applicability of gross-valuation misstatement penalties in this situation is an open question in the Tenth Circuit, Mr. Blum urges us to

20

find that the text, legislative history, and underlying public policy of I.R.C. § 6662 prohibit the imposition of the penalty here. The Supreme Court recently answered this open question in a way that forecloses Mr. Blum's argument. United States v. Woods, No. 12-562 (U.S. Dec. 3, 2013). Accordingly we affirm the Tax Court's decision.

Before we proceed to Mr. Blum's arguments, we offer a quick overview of the gross-valuation misstatement penalty. The penalty is, in a nutshell, a fine to be paid when a taxpayer makes a relatively large error on his tax return and ends up paying less than she actually owes. I.R.C. § 6662(b) & (e). Valuation misstatements include misstatements of basis. *Id.* Typically the penalty for a gross valuation misstatement is 20 percent, but if the taxpayer misstates her basis by 400 percent or more the penalty increases to 40 percent. I.R.C. § 6662(h).

Here, after the Commissioner disallowed the OPIS basis-shifting scheme, that left Mr. Blum's $45 million capital gain from his sale of Buy.com stock unprotected. As a result, he owed taxes on that money—taxes he didn't pay. The Commissioner identified this as an underpayment. Mr. Blum originally claimed a basis in UBS stock and options totaling $48.3 million. Once that amount was invalidated under the economic substance doctrine, Blum's actual basis in the transaction was no more than what he actually paid for the stock and options—that is, $2.25 million for the stock and $675,000 for the options. The misstatement between the two amounted to over 1,200 percent. Because

the size of Mr. Blum's misstatement exceeded 400 percent, the Commissioner imposed the larger 40 percent penalty.[4]

Whether the gross-valuation misstatement penalty applies to misstatements of basis associated with transactions voided under the economic substance rule is a pure question of law, and we review the Tax Court's conclusion de novo. *Koch Indus., Inc. v. United States*, 603 F.3d 816, 821 (10th Cir. 2010).

The majority of circuits allowed the penalty to apply when the economic substance doctrine invalidates the underlying transaction. *See Gustashaw v. Comm'r*, 696 F.3d 1124, 1136-38 (11th Cir. 2012); *Fidelity Int'l v. United States*, 661 F.3d 667, 671-75 (1st Cir. 2011); *Massengill v. Comm'r*, 876 F.2d 616, 619-20 (8th Cir. 1989); *Zfass v. Comm'r*, 118 F.3d 184, 190-91 (4th Cir. 1997); *Merino v. Comm'r*, 196 F.3d 147, 155, 157-59 (3d Cir. 1999); *Illes v. Comm'r*, 982 F.2d 163, 167 (6th Cir. 1992); *Gilman v. Comm'r*, 933 F.2d 143, 151 (2d Cir. 1991).[5] *But see Heasley v. Comm'r*, 902 F.2d 380, 383 (5th Cir. 1990); *Keller v. Comm'r*, 556 F.3d 1056, 1061 (9th Cir. 2009). The Tax Court and Court of Federal Claims also adopted the majority approach. *See New Phoenix*

---

[4] The tax court applied the gross valuation misstatement penalty because the underpayment "stem[med] from deductions or credits" that were disallowed because they lacked economic substance. Op. at 40. The tax court did not clearly state whether Mr. Blum's basis was the $2.25 million cost basis for the stock he purchased or zero. Under either scenario, however, Mr. Blum misstated his basis by over 400 percent and therefore the gross valuation misstatement penalty should apply. *See Crispin v. Comm'r,* 708 F.3d 507, 517-18 (3d Cir. 2013).

[5] After the parties filed their briefs with this Court, the Seventh Circuit adopted the majority position regarding Section 6662. *Superior Trading, LLC v. Comm'r*, 728 F.3d 676, 682 (7th Cir. 2013) ("taxpayer who overstates basis and participates in sham transactions, as in this case, should be punished at least as severely as one who does only the former").

*Sunrise Corp. v. Comm'r*, 132 T.C. 161, 187-89 (2009), *aff'd*, 408 Fed. App'x 908 (6th Cir. 2010); *Clearmeadow Invs., LLC v. United States*, 87 Fed. Cl. 509, 530-36 (2009). The Supreme Court has now resolved the split in favor of the majority approach. Invalidation of a transaction under the economic substance doctrine does not prohibit the imposition of the gross valuation misstatement penalty. The Tax Court's decision allowing the penalty in Mr. Blum's case is upheld.

C. The Negligent Underpayment Penalty

The Tax Code also establishes penalties for negligent underpayment of taxes, separate from the gross valuation misstatement penalties discussed above. The Commissioner imposed a 20 percent penalty upon Mr. Blum for negligent underpayment of taxes on his 1999 return. The Tax Court affirmed that penalty, and Mr. Blum appeals. We affirm the Tax Court's opinion, but in so doing we recognize that KPMG instigated this tax evasion scheme, even going so far as to prepare Mr. Blum's client representation letter and telling him, in effect, "sign here." Nevertheless, Mr. Blum was properly penalized because (1) he knew that KPMG was not rendering independent tax advice; (2) he signed the representation letter containing a material misrepresentation, albeit one that was drafted by KPMG; and (3) he filed his return claiming the improper deduction before he received KPMG's formal tax opinion. Any one of these grounds would be sufficient in itself to justify the imposition of the penalty.

Section 6662(b)(1) of the Tax Code allows the IRS to impose a 20% penalty if the taxpayer's underpayment resulted from negligence. Negligence is "strongly indicated" if a "taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction,

23

credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." 26 C.F.R. § 1.6662-3(b)(1) & (b)(1)(ii). This accuracy-based penalty for negligence is not available if the taxpayer reasonably and in good faith relied upon professional tax advice. I.R.C. § 6664(c)(1); *United States v. Boyle*, 469 U.S. 241, 251 (1985). This is, however, a "narrow defense." *Stobie Creek Invs.*, 608 F.3d at 1381. In determining whether reasonable cause and good faith exist, the most important factor is "the extent of the taxpayer's effort to assess the taxpayer's proper tax liability" judged in light of his experience, knowledge, and education. 26 C.F.R. § 1.6664-4(b). A common issue within the reasonable cause analysis is the taxpayer's reliance on the advice of a professional tax advisor. Such reliance, however, "does not necessarily demonstrate reasonable cause." 26 C.F.R. § 1.6664-4(b).

Professional advice providing the basis of a reasonable cause defense typically exhibits certain characteristics, of which three are particularly applicable in this case. First, the advice must be independent. *Van Scoten v. Comm'r*, 439 F.3d 1243, 1253 (10th Cir. 2006). Second, the advice must be based on all relevant facts and no inaccurate factual representations. 26 C.F.R. §1.6664-4(c). And third, reasonable cause requires that the taxpayer actually receive the advice and rely upon it before claiming the tax benefit. *Conway v. United States*, 326 F.3d 1268, 1279 (Fed. Cir. 2003). The advice that Mr. Blum received from KPMG exhibited none of these qualities, and therefore he cannot claim the defense of reasonable cause and good faith for his negligent underpayments resulting from the OPIS scheme.

24

Mr. Blum recites a litany of reasons why his reliance on KPMG's advice should excuse him from paying this penalty. He asked his trusted advisors about KPMG's reputation; he did not read KPMG's opinion letter, and perhaps he was unaware of any factual misrepresentations contained within it; and he promises that he relied on KPMG's advice in deciding to participate in OPIS. We do not minimize KPMG's important role in creating the tax shelter and leading Mr. Blum down the path. There is enough fault to go around. However, even if we accept Mr. Blum's claims at face value, they do not establish reasonable cause, because they miss the point. Mr. Blum still relied on a company that was not independent, he signed an opinion letter that he knew or should have known contained a material misrepresentation, and he claims to have relied on advice that he didn't receive until after he filed his taxes.

Mr. Blum knew or should have known that KPMG was not an independent advisor in this context. KPMG's role as a promoter—i.e. someone who stood to make a profit off the transaction—made reliance unreasonable. Mr. Blum learned about the deal from KPMG and knew that the company was promoting it to other clients. Just because Mr. Blum had "earlier bona fide dealings" with KPMG does not mean he was justified in overlooking their promotion of the OPIS scheme in this case. *See 106 Ltd. v. Comm'r*, 684 F.3d 84, 92 (D.C. Cir. 2012) (citing *Stobie Creek Invs.*, 608 F.3d at 1383). Mr. Blum's citation to *Mauerman v. Comm'r*, 22 F.3d 1001, 1006 (10th Cir. 1994) is inapposite. In *Mauerman*, we did indeed hold that a taxpayer may rely on the professional advice of someone who had previously prepared the taxpayer's taxes.

25

However, we noted that the tax preparers in that case were "independent." *Id.* That is not the case here.

The KPMG opinion letter that Mr. Blum signed contained statements that Mr. Blum knew or should have known were false. The advice stated that it depended on the representation that Mr. Blum had reviewed the economics of the deal and expected to earn a profit. Ex. 98 at 1, 8. He knew that he had not reviewed the economics of the deal himself, nor had he asked his advisors (other than KPMG) to do so. Mr. Blum neglected to do this despite KPMG's explicitly stating that its opinion letter was premised on an independent evaluation of the transaction. Ex. 12. Because a reasonable cause defense depends on the presence of advice not based on "inaccurate representation or assumption as to the taxpayer's purposes for entering into a transaction" that generated the disputed benefits, this misrepresentation means that Mr. Blum cannot claim the defense in this case. 26 C.F.R. § 1.6664-4(c). *See 106 Ltd.*, 684 F.3d at 92-93; *Fidelity Int'l Currency Advisor A Fund, LLC v. United States*, 747 F. Supp. 2d 49, 242-44 (D. Mass. 2010).

Mr. Blum claims that the Commissioner is arguing that Mr. Blum "hoodwinked" a Big Four accounting firm. Appellant Reply 28. That is not how we interpret the Commissioner's argument. KPMG knew what it was doing. The facts we know today indicate that KPMG was the mastermind behind the tax sheltering schemes. However, just because KPMG misbehaved does not mean Mr. Blum is without fault. In particular, the reasonable cause exception requires that he prove he did not provide inaccurate information to KPMG. But, in fact, he did. KPMG may have acted nefariously, but that does not excuse Mr. Blum's negligence.

26

Finally, Mr. Blum cannot claim good faith reasonable reliance on KPMG's professional tax advice in this case because he filed the taxes at issue before receiving any advice from KPMG. The Tax Court observed that "[t]he record does not show when the opinion [letter] was finalized, but we know that it was finalized after petitioners filed the tax return for 1998." Op. 44-45. Mr. Blum's argument that the face of the letter indicates it was sent earlier and that it is not in draft form does not provide convincing evidence that he received it before he filed his tax returns. Moreover, the opinion letter is not the same as the April 19, 1999 representations letter. The latter did not purport to provide advice, and it cannot be the basis for a reasonable cause defense.

In his reply brief, Mr. Blum raises an argument that KPMG did not base its tax advice on the alleged misrepresentations in the opinion letter. The gist of his argument is that the IRS regulations state that it is reasonable to rely on professional advice unless that advice is "based upon" bad information. Because, according to Mr. Blum, KPMG took advantage of him, KPMG knew from the beginning that it would issue the opinion letter regardless of whether the facts therein were true or false. He notes that "KPMG's opinion was thus not 'based upon' Blum's alleged misrepresentations. Appellant Reply 29 (citing 26 C.F.R. § 1.6664-4(c)(1)(i) & (ii)).

This argument is clever, but again it misses the point. The advice contained in the opinion letter was premised on the fact—attested to by Mr. Blum—that he had a reasonable, non-tax economic reason for entering into the transaction. The fact that KPMG *also* probably knew it to be false is irrelevant for purposes of this penalty. Even if the statements that Mr. Blum had independently reviewed the economics of the

27

transaction and found them to be profitable were boilerplate, several other courts have found similar misrepresentations and omissions relevant in determining that reliance on a tax adviser was not reasonable. *See, e.g.*, *Crispin*, 708 F.3d at 519 (finding no reasonable reliance because Mr. Crispin represented to a law firm that provided him with a tax opinion (1) that he had a valid business purpose when he knew or should have known that representation was false; and (2) that no party had provided him any tax related promotional material to him prior to his entering into the transaction even though he had received such materials). *See also Kerman v. Commissioner*, 713 F.3d 849 (6th Cir. 2013) (finding no reasonable reliance where taxpayer affirmed he reviewed economic substance of transactions when he had not).

D. Preclusive Effect of Affirming the Negligence Penalty

Before concluding, we turn to Mr. Blum's concern that the Tax Court's opinion, if allowed to stand, will bar him from pursuing his civil claims against KPMG. The District Court overseeing Mr. Blum's civil case concluded that collateral estoppel prohibits Mr. Blum from arguing KPMG was negligent in preparing his taxes. *See Blum v. KPMG*, *LLP*, No. SACV 11-01885-CJC (C.D. Cal. July 17, 2012) (Order).

Ultimately it is not our place to decide whether the Tax Court's decision and our affirmance or reversal should collaterally estop Mr. Blum's claims in other courts. Furthermore, we agree with the Commissioner, in his supplemental briefing on this issue, that even if we were to affirm on more limited grounds, we could not guarantee that such a ruling would have any impact on the District Court's collateral estoppel analysis. It is worth noting, however, that the District Court did not "expressly predicat[e]" its ruling on

28

the Tax Court's finding that OPIS lacked economic substance. *Contra* Appellee Supp. Br. 10. Rather the District Court pointed to both the lack of economic substance and the reasonableness of Mr. Blum's reliance on KPMG and appeared to treat these as separate issues, both of which were collaterally estopped. *See, e.g.*, *Blum*, No. SACV 11-01885-CJC at *6 ("Mr. Blum is now collaterally estopped from litigating the issues of whether he believed OPIS was a legitimate investment strategy and whether he relied on KPMG's advice to that effect.").

In any event, we find that the Tax Court reached correct conclusions regarding each of the independent reasons why Mr. Blum could not prove reasonable cause to rely on KPMG for purposes of avoiding a negligent underpayment penalty. We simply note that the Tax Court's opinion on reasonable reliance and good faith appears narrowly tailored to this penalty provision. Op. 44 ("[W]e do not find that petitioners actually relied on KPMG in good faith for purposes of the reasonable cause and good faith defense to accuracy-related penalties."). In fact, the Tax Court concluded that Mr. Blum "certainly relied on KPMG, and KPMG's failures toward its client during and after the years at issue are well-documented." *Id.* We cannot provide an opinion about the relationship these conclusions have to the applicable law in Mr. Blum's civil case. Perhaps these issues are sufficiently similar to satisfy the prerequisites for collateral estoppel. Perhaps they are not. But that is an issue for the Central District of California or the Ninth Circuit Court of Appeals to decide. The question is not properly before this Court.

29

## IV. <u>Conclusion</u>

The judgment of the Tax Court is affirmed.