**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 26, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

---

In re: JAMES CHARLES VAUGHN,

 Debtor.

_____

JAMES CHARLES VAUGHN,

 Appellant,

v.                                                  No. 13-1189

UNITED STATES OF AMERICA
INTERNAL REVENUE SERVICE,

 Appellee.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:12-CV-00060-MSK)**

---

Joseph J. Mellon of The Mellon Law Firm, Denver, Colorado, for Appellant.

Rachel I. Wollitzer, Attorney, Tax Division (John F. Walsh, United States
Attorney, Of Counsel; Kathryn Keneally, Assistant Attorney General; and Bruce
R. Ellisen, Attorney, Tax Division, with her on the brief), Department of Justice,
Washington, D.C., for Appellee.

---

Before **TYMKOVICH, McKAY,** and **MATHESON,** Circuit Judges.

---

**McKAY**, Circuit Judge.

This appeal arises from an adversary proceeding initiated by Appellant James Charles Vaughn seeking a declaration that his taxes assessed for the years 1999 and 2000 are dischargeable under his Chapter 11 bankruptcy petition. After a trial, the bankruptcy court determined the taxes were not dischargeable under 11 U.S.C. § 523(a)(1)(C) because Appellant had filed a fraudulent tax return and sought to evade those taxes. The bankruptcy court's decision was affirmed by the federal district court on appeal. Appellant now appeals the district court's order affirming the bankruptcy court's decision.

**I.**

The following material facts were among those presented to the bankruptcy court at trial. In the mid-nineties, Appellant was Chief Executive Officer of a cable television acquisition company, FrontierVision Partners, LP. Though Appellant had little formal education beyond high school, he had significant practical business experience. In the decade-and-a-half prior to becoming CEO of FrontierVision, Appellant served in senior executive positions at a number of cable and communication companies. Appellant was so effective in these positions he was described by one of his colleagues, the Chief Financial Officer at FrontierVision, Jack Koo, as having "as much business acumen as anyone that [Mr. Koo had] known in [his] career." (Supplemental App. at 591.)

Between the years 1995 and 1999, Appellant shepherded FrontierVision as

it grew from a start-up venture into a multi-billion dollar company. In 1999, FrontierVision was sold to another company for roughly $2.1 billion. Appellant received approximately $20 million in cash and $11 million in the purchasing company's stock from this sale.

Appellant testified that around the time of the FrontierVision sale, he realized he "was going to come into a lot of money," and he "needed to do some kind of tax planning, whatever it turned out to be." (Supplemental App. at 532-533.) In June 1999, a partner of the international accounting firm KPMG LLP introduced Appellant to a tax strategy known as Bond Linked Issue Premium Structure ("BLIPS"), which was a product offered by a company called Presidio Advisory Services LLC and marketed by KPMG. FrontierVision had an established relationship with KPMG, which had handled a number of acquisition, tax, and accounting matters for FrontierVision since 1995.

Through a series of communications with representatives of KPMG and Presidio, BLIPS was presented to Appellant in detail. BLIPS was described as a structured, multi-stage program that involved investment in foreign currencies. BLIPS's use as a tax strategy resulted from the manner in which the program combined a participant's relatively small cash contribution to an investment fund (made through a limited liability company), with a nonrecourse loan and a loan premium, ultimately facilitating a high tax loss for the participant without a corresponding economic loss. Through BLIPS, a desired tax loss could be

tailored to offset a participant's actual economic gain, and thereby shelter that gain from tax. The BLIPS program was structured so the basis for a desired tax loss would be achieved by closing out the investment fund after sixty days. In fact, Appellant testified he understood that the ultimate amount he would contribute to his BLIPS investment fund was based on the tax loss he wished to generate to offset his capital gain from the sale of FrontierVision. He also testified that when he entered the BLIPS program in October 1999, he did so knowing he would withdraw by the end of the year—after roughly sixty days—essentially guaranteeing his BLIPS transaction would generate a tax loss covering his capital gains.

KPMG advised Appellant that BLIPS was accompanied by the risks of an IRS audit and the possibility of owing additional taxes. KPMG advised Appellant that in order for a BLIPS transaction to withstand a challenge by the IRS, a participant needed to have a legitimate profit motive in the BLIPS investment. Appellant appreciated the risks associated with BLIPS, stating he understood the BLIPS program "as a choice between paying $9 million of taxes currently or claiming the benefits of [the BLIPS] losses and paying $3 million currently with some risk of paying more taxes later." (Appellant's App. at 1189.) Appellant memorialized his appreciation of these risks when he signed an engagement letter in September 1999 which stated he "acknowledge[d] that [BLIPS] is aggressive in nature and that the [IRS] might challenge the intended results of [BLIPS] and

could prevail under any of various tax authorities." (Supplemental App. at 124.)
The letter further stated Appellant "acknowledge[d] that any tax opinion issued by
KPMG would not guarantee tax results, but would provide that with respect to the
tax consequences described in the opinion, there is a greater than 50 percent
likelihood (i.e., it is 'more likely than not') that those consequences will be
upheld if challenged by the [IRS]." (*Id.* at 123.) The engagement letter also set
forth the $506,000 fee Appellant was to pay KPMG for its role in advising
Appellant regarding BLIPS.

The sale of FrontierVision closed on October 1, 1999. Shortly thereafter,
between the months of October and December, Appellant participated in a BLIPS
transaction. As a result of Appellant's artificially high basis in his BLIPS LLC,
his $2.8 million contribution to a BLIPS investment fund, when combined with a
loan and loan premium issued to his BLIPS LLC, generated a purported tax loss
of roughly $42 million upon Appellant's withdrawal from the BLIPS investment
and the disposition of the BLIPS LLC's assets.

On April 11, 2000, Appellant reviewed and signed his 1999 tax return.
Appellant reported a long-term capital gain of approximately $30.6 million as a
result of the sale of FrontierVision. However, he also reported a short-term
capital loss of roughly $32.3 million as a consequence of his BLIPS transaction.
He further reported an ordinary loss of roughly $3.3 million based on his BLIPS
participation. These claimed losses were sufficient to offset Appellant's capital

gains from the sale of FrontierVision. Appellant admitted at his deposition—and denied at trial—that he had been instructed by one of the partners of KPMG not to claim the full amount of his BLIPS capital loss on his return in order to avoid arousing suspicion. (Supplemental App. at 473-74.) Furthermore, Appellant testified that when he signed the 1999 return, he knew he had not suffered an economic loss corresponding to his claimed tax loss.

In September 2000, the IRS issued Internal Revenue Bulletin Notice 2000-44, in which the IRS discussed "arrangements [that] purport to give taxpayers artificially high basis in partnership interests and thereby give rise to deductible losses on disposition of those partnership interests," including schemes "involv[ing] a taxpayer's borrowing at a premium and a partnership's subsequent assumption of that indebtedness." (Appellant's App. at 1146.) While BLIPS was not specifically mentioned in the notice, the type of transactional scheme described in the notice perfectly described BLIPS. The IRS stated that purported losses resulting from such transactions "are not allowable as deductions for federal income tax purposes" because they "do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165" of the Internal Revenue Code. (*Id.*) In the wake of this bulletin, KPMG issued a directive requiring BLIPS clients to be notified of Notice 2000-44. Appellant was informed of Notice 2000-44 by KMPG and provided with a copy of the bulletin by February 2001. (*Id.* at 801.)

In March 2001, Appellant separated from his then wife, Cindy Vaughn, and purchased a townhome for $1.4 million. In September, the couple divorced. Pursuant to a separation agreement, Ms. Vaughn received the couple's marital residence—valued at $2.5 million—and five luxury and collector vehicles—valued collectively at roughly $260,000—while Appellant received the recently purchased townhome and a Mercedes SUV. The couple's Morgan Stanley investment accounts—valued at $18 million—were divided equally. The couple's divorce decree was entered on September 13, 2001.

Shortly after separating from Ms. Vaughn, Appellant entered a relationship with another woman, Kathy St. Onge. In April 2001, Appellant purchased Ms. St. Onge a new BMW. In mid-September 2001, Appellant became engaged to Ms. St. Onge. Around this time, Appellant purchased a $1.73 million home with his own funds, with the home titled in Ms. St. Onge's name only. Appellant married Ms. St. Onge in October 2001.

Meanwhile, in June 2001, Mr. Koo, who had also participated in BLIPS, was notified he was to be audited in relation to his BLIPS participation. In a proof of claim related to a subsequent lawsuit against KPMG, Appellant indicated that Mr. Koo contacted Appellant about the audit shortly after June 2001.[1] In

---

[1] While the bankruptcy court received conflicting testimony regarding when Appellant was informed of Mr. Koo's audit, the bankruptcy court ultimately determined Appellant had learned of the audit in 2001.

-7-

February 2002, KPMG representatives met with Appellant and informed him that because they were being examined by the IRS in connection with BLIPS, it was likely that Appellant would be identified by the IRS as a BLIPS participant and his 1999 tax return would be subject to audit. Therefore, the representatives suggested that Appellant participate in an IRS voluntary-disclosure program, which permitted taxpayers to avoid certain penalties by voluntarily disclosing their participation in a tax shelter. Following this meeting, KPMG sent Appellant a letter reiterating the recommendation that Appellant voluntarily disclose his participation in BLIPS to the IRS and reemphasizing the likelihood the IRS would acquire information regarding Appellant's participation in the BLIPS program.

In the month following these communications by KPMG, Appellant established an irrevocable trust for his step-daughter, Ms. St. Onge's daughter, on March 4, 2002. Appellant transferred $1.5 million dollars into the trust the day it was established. Ms. St. Onge was named as the trustee and secondary beneficiary. Around three weeks after creating this trust, Appellant submitted a voluntary disclosure of his participation in the BLIPS program to the IRS. Shortly thereafter, in May 2002, the IRS notified Appellant his 1999 tax return was to be examined. Subsequently, Appellant was notified his BLIPS investment fund was being investigated.

Throughout this time period, Appellant and Ms. St. Onge spent money in large amounts. For instance, between October 2001 and April 2003, the couple

wrote checks to cash, or to themselves, totaling $157,000. Throughout their marriage, which ended in March 2003, the couple spent thousands of dollars in monthly charges to various credit card accounts and spent similarly substantial sums of money on such things as home decoration, jewelry, and cars.

When the couple divorced, Ms. St. Onge received the marital home, two luxury cars, and $3.5 million of the couple's brokerage account. Appellant kept his townhome (by then worth only half of its original purchase price as a result of flood damage), a pick-up truck, a 2002 Chevy Trailblazer, and the remaining balance of the brokerage account, which was smaller than the $3.5 million portion received by Ms. St. Onge. While Ms. St. Onge retained counsel, Appellant did not, nor did he dispute the division of assets.

Immediately prior to his divorce from Ms. St. Onge, the IRS notified Appellant that his ex-wife, Cindy Vaughn, had filed a request for innocent-spouse relief with respect to their 1999 tax return. In August of 2003, Appellant filed his own request with the IRS for such relief, stating in a supporting affidavit that "[b]ecause of the inequitable transfers of assets to Cindy pursuant to divorce, I do not have the assets to pay all the deficiencies attributable to [BLIPS]." (Appellant's App. at 1198.) He further stated in the affidavit that he "would be bankrupt if the IRS assesses and collects the full . . . liability" attributed to his BLIPS participation. (*Id.*) He also stated that while he "received about $10.4 million of assets in the divorce [from Ms. Vaughn]. . . since then [his] net worth

has dropped to about $4 million." (*Id.*) While Appellant's request for innocent-spouse relief mentioned he had been remarried and divorced since his divorce from Ms. Vaughn, he did not mention the trust set up for his step-daughter, nor did he mention the unequal division of assets during his divorce from Ms. St. Onge.

In March 2004, Appellant filed an amended 1999 tax return from which he did not remove his BLIPS-generated losses. In May 2004, the IRS issued an announcement regarding a settlement initiative for participants in BLIPS-type tax shelters. While Appellant sought to participate in this settlement program, he was ineligible because he was unable to make full payment of his tax liabilities related to his participation in BLIPS.

In June 2004, the IRS notified Appellant of an approximately $8.6 million tax deficiency arising from the IRS's determination that Appellant had overstated his losses as a result of his BLIPS participation. In a subsequent notice, the IRS notified Appellant of an additional tax deficiency of roughly $120,000 for the year 2000 relating to the carryforward of a disallowed investment-interest expense arising out of Appellant's BLIPS participation.

## II.

In November 2006, Appellant filed his Chapter 11 bankruptcy petition. The IRS subsequently filed a proof of claim in that action for tax assessments for

the years 1999 and 2000 in the amount of $14,359,592.[2]  Appellant initiated an adversary proceeding seeking a declaration that the taxes were dischargeable. The matter proceeded to trial, whereupon the bankruptcy court found that Appellant had both filed a fraudulent tax return and willfully evaded his taxes, which provided two independent grounds for finding his tax liability non-dischargeable under 11 U.S.C. § 523(a)(1)(C).  Under this section, statutory discharges do "not discharge an individual debtor from any debt [] for a tax or customs duty . . . with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).

Appellant appealed the bankruptcy court's decision to the federal district court, which affirmed the bankruptcy court's order.  However, finding "no error with regard to the Bankruptcy Court's determination that [Appellant] willfully attempted to evade his 1999 and 2000 tax obligations," thereby rendering his tax obligations non-dischargeable, the district court declined to address the question of whether Appellant filed a fraudulent tax return.  *Vaughn v. IRS*, No. 12-CV-

---

[2] We note the IRS initially filed its "proof of claim for $14,359,592 as an unsecured claim, stating at that time the taxes were not entitled to priority under 11 U.S.C. § 507(a)(8)(A)."  *Vaughn v. IRS (In re Vaughn)*, 463 B.R. 531, 539 (Bankr. D. Colo. 2011).  However, realizing this to be an error, the "IRS abated the 2004 Assessment as unlawful, and on April 10, 2008, . . . filed its amended proof of claim, asserting the taxes were entitled to priority."  *Id.* at 540.

00060-MSK, 2013 WL 1324377 (D. Colo. Mar. 29, 2013) (unpublished) at *2.[3] In the course of its opinion, the district court stated that the bankruptcy court "engaged in a comprehensive and holistic review . . . of the evidence," *id.* at *5, when faced with the difficulty of "attempt[ing] to follow the elemental approach" to willful evasion under § 523(a)(1)(C), which generally requires that "two, discrete elements . . . be proved in order to reach a 'willful evasion' determination: (i) a conduct requirement; and (ii) a mental state requirement," *id.* at *5 n.8.

## III.

Appellant now raises two primary issues on appeal. First, Appellant argues the district court impermissibly employed "a 'holistic' review of the evidence to support its affirmance of the Bankruptcy Court's willful evasion determination" in order to avoid determining whether the evidence before the bankruptcy court satisfied "the two discrete elements of willful evasion." (Appellant's Opening Br. at 2.) Second, Appellant argues the bankruptcy court's finding that Appellant willfully attempted to evade his tax obligations was erroneously based on negligent, rather than willful, conduct.

---

[3] Despite numerous allusions to the bankruptcy court's fraudulent return finding in Appellant's briefing to this court on appeal, Appellant urges that "[b]ecause the District Court did not rule on [it], the fraudulent return finding by the Bankruptcy Court was not argued in Appellant's opening brief." (Appellant's Reply Br. at 1.) Therefore, we limit our review to the issue of whether Appellant willfully attempted to evade his tax obligations.

"Our review of the bankruptcy court's decision is governed by the same standards of review that govern the district court's review of the bankruptcy court. Accordingly we review the bankruptcy court's legal determinations *de novo* and its factual findings under the clearly erroneous standard." *Conoco v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996) (citations omitted).

Regarding the first issue, Appellant argues that the district court impermissibly construed our opinion in *Dalton v. IRS*, 77 F.3d 1297 (10th Cir. 1996) to allow a "holistic" review of the evidence before the bankruptcy court. While the district court included a lengthy footnote in its opinion discussing the expediency of such a "holistic" review in light of *Dalton*, *see Vaughn v. IRS*, 2013 WL 1324377, at *5 n.8, no such "holistic" review was mentioned or applied by the bankruptcy court. Because "[o]ur review [is] of the bankruptcy court's decision," *Conoco*, 82 F.3d at 959, we need not consider the district court's application of holistic review. The bankruptcy court explicitly noted that "[t]he most recent appellate decision addressing § 523(a)(1)(C) identified two components to a showing of willful evasion: 1) a conduct requirement; and 2) a mental state requirement." *Vaughn v. IRS (In re Vaughn),* 463 B.R. 531, 545 (Bankr. D. Colo. 2011) (citing *United States v. Storey*, 640 F.3d 739, 744 (6th Cir. 2011)). The bankruptcy court applied this two-element approach, citing factual findings in support of the conduct and mental state requirements

-13-

separately, with each requirement commanding its own subsection of the bankruptcy court's opinion.  Since the bankruptcy court, which is the subject of our ultimate review, applied the two-element approach in determining that Appellant willfully attempted to evade a tax, we need not determine whether the district court's application of a "holistic" review of the evidence before the bankruptcy court is permissible under our decision in *Dalton*.

Turning to whether the bankruptcy court properly found the Appellant willfully, rather than negligently, attempted to evade or defeat his tax liability, we note that  "[w]hether or not a debtor willfully attempted to evade or defeat a tax [under 11 U.S.C. § 523(a)(1)(C)] is a question of fact reviewable for clear error."[4] *United States v. Jacobs (In re Jacobs)*, 490 F.3d 913, 921 (11th Cir. 2007) (citing *Dalton*, 77 F.3d at 1302).  "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made."  *Conoco*, 82 F.3d at 959.  Where, as here, certain "findings are based on determinations regarding the credibility of witnesses, Rule 52(a) [of the Federal Rules of Civil Procedure] demands even greater deference to the trial court's findings."

---

[4] Appellant argues we ought to review the bankruptcy court's willful evasion determination de novo, claiming the bankruptcy court erred as a matter of law by applying a negligence standard to find that Appellant evaded his tax obligation.  For the reasons discussed below, we are not persuaded the bankruptcy court based its finding of willful evasion on negligent, rather than willful, conduct.

*Anderson v. Bessemer City,* 470 U.S. 564, 575 (1985).

The bankruptcy court explicitly found that "[Appellant's] actions meet the state of mind test to show intent to evade tax" under § 523(a)(1)(C). *In re Vaughn*, 463 B.R. at 548. In making this finding, the bankruptcy court quoted this court's holding that a "debtor's actions are willful under § 523(a)(1)(C) if they are done voluntarily, consciously or knowingly, and intentionally." *Dalton*, 77 F.3d at 1302. The bankruptcy court also noted that § 523(a)(1)(C)'s mental state requirement is generally satisfied "where the government shows the following three elements: 1) the debtor had a duty under the law; 2) the debtor knew he had the duty; and 3) the debtor voluntarily and intentionally violated the duty." *In re Vaughn*, 463 B.R. at 546 (citing *Jacobs*, 490 F.3d at 921 and *Hawkins v. Franchise Tax Bd.*, 447 B.R. 291, 300 (N.D. Cal. 2011)). Applying these principles, the bankruptcy court found Appellant knew he "had a duty under the law" which he "voluntarily and intentionally violated," thus satisfying § 523(a)(1)(C)'s mental state requirement. *Id.* The bankruptcy court cited several facts in support of this finding, including the following: the fact Appellant "exhibited behavior which was inconsistent with his business acumen" by "participat[ing] in the BLIPS investment" and subsequently depleting his assets, "knowing as he must have, the BLIPS investment constituted an improper abusive tax shelter with no economic basis and no reasonable expectation of profit"; Appellant's knowledge of Mr. Koo's BLIPS-related audit in 2001; Appellant's

-15-

receipt of the IRS's Notice 2000-44 in early 2001; Appellant's receipt of

notification from KPMG in early 2002 regarding the IRS's investigation into

BLIPS and KPMG's opinion that the investigation would likely lead to Appellant

being audited for his BLIPS participation; and Appellant's "purchas[e of]

expensive homes, automobiles, and jewelry, following a divorce which

significantly depleted his assets," "as if there would be no additional tax to pay,"

despite the aforementioned facts. *In re Vaughn*, 463 B.R. at 547. The bankruptcy

court likewise found Appellant's actions, taken in light of Appellant's knowledge

of his impending tax liability, satisfied the conduct requirement of §

523(a)(1)(C).[5]

Appellant offers four primary arguments in support of his assertion that the

---

[5] The bankruptcy court cited a number of facts supporting its finding that Appellant's actions satisfied § 523(a)(1)(C)'s conduct requirement. For instance, the bankruptcy court found that even though "he had transferred approximately one-half of his post-Frontier[]Vision sale assets to Cindy Vaughn as part of their divorce settlement, he failed to take any actions to preserve his remaining assets for the payment of additional taxes," notwithstanding the fact that he "knew he had a potential [tax] liability on the full amount of his gain from the Frontier[]Vision sale." *In re Vaughn*, 463 B.R. at 546. Instead he made numerous large expenditures, including the "purchase[] of a $1.7 million home . . . [the title of which was] in the sole name of . . . Kathy St. Onge," the creation and funding of "a $1.5 million trust for his step-daughter" shortly before disclosing his participation in BLIPS to the IRS, and several purchases of jewelry and other luxury items. *Id.*; *see Hawkins,* 447 B.R. at 301 (*"*[L]arge discretionary expenditures, combined with nonpayment of a known tax, contribute[] to the conduct analysis. Moreover nonpayment of a tax can satisfy the conduct requirement when paired with even a single additional culpable act or omission."); *see also Jacobs*, 490 F.3d at 926-27 (stating that large discretionary expenditures are relevant to the § 523(a)(1)(C) conduct element).

bankruptcy court's willful evasion finding was based on negligent conduct rather than the willful conduct required by the text of § 523(a)(1)(C). First, Appellant argues that a finding of "willful evasion requires knowledge that a tax is owed—not just knowledge of a possibility that the IRS might assess tax liability sometime in the future." (Appellant's Opening Br. at 32.) Appellant argues that because the spending and asset disposition cited by the bankruptcy court in support of its willful evasion finding "took place long before the IRS assessed a tax penalty," the willful evasion finding is, at best, "premised on [Appellant's] disposition of his assets when he arguably should have known that the IRS might assess a tax in the future, if it rejected [Appellant's] BLIPS transaction." (*Id.* at 25 (emphasis in original).) Appellant argues that such a "determination of evasion based upon a potential tax liability is really just a . . . negligence finding." (*Id.* at 27 (internal quotation marks and brackets omitted).)

Contrary to Appellant's assertions, we have previously held that the assessment of a tax is not required in order for a debtor's conduct to be considered willful. In *Dalton*, we held that the actions of a debtor— including the purchase of a condominium and the transfer of funds to his fianceé— taken when he "knew of [a] tax investigation which was likely to result in a significant assessment," but prior to an actual tax assessment, were willful for purposes of § 523(a)(1)(C). 77 F.3d at 1303. Additionally, a number of courts have unequivocally stated that the failure to file a tax return, which necessarily occurs

-17-

before a tax is assessed or concretely known, is considered a willful omission under § 523(a)(1)(C). *See, e.g., United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1329 (11 Cir. 2001); *United States v. Fegeley (In re Fegeley)*, 118 F.3d 979, 983-84 (3d Cir. 1997); *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996). These authorities establish that actions taken with knowledge of an anticipated tax obligation can be considered willful, rather than negligent, thus rendering tax debts non-dischargeable in bankruptcy. To the extent Appellant ultimately disputes that he did not know of the anticipated tax obligation, the bankruptcy court found to the contrary and that conclusion was not clearly erroneous.

Second, Appellant argues his "reliance on the advice of KPMG, his longtime tax advisor, that the BLIPS transaction was an aggressive but ultimately legitimate tax position might have been at worst unreasonable under the circumstances, making [Appellant] negligent," but not willful. (Appellant's Opening Br. at 23.) Appellant contends that because he innocently, even if unreasonably, relied on KPMG's advice, he cannot be found to have acted willfully. We find this argument unpersuasive under all of the circumstances in this case, particularly in light of the bankruptcy court's finding that Appellant's assertion of innocent reliance was "simply not credible." *In re Vaughn*, 463 B.R. at 548.

Third, Appellant suggests our recent opinion in *Blum v. Commissioner*, 737 F.3d 1303 (10th Cir. 2013), must control our review of this case. The facts in

-18-

*Blum* are similar to those in Appellant's case.  The plaintiff in *Blum* was a self-made business man who participated in a different tax shelter marketed by KPMG.  The IRS sent the *Blum* plaintiff a notice disallowing the losses he claimed in connection with the tax shelter and imposing "two accuracy-related penalties for underpayment of taxes," *id.* at 1306, including a penalty for "negligent underpayment" under I.R.C. § 6662(b).  The tax court upheld this decision.  On appeal, we affirmed the imposition of the negligent underpayment penalty, despite the *Blum* plaintiff's assertion that he merely relied on KPMG's representations regarding the validity of the tax shelter.  In the case before us, Appellant argues our decision affirming a negligent underpayment penalty in *Blum* "confirms[ that Appellant's] decision to rely on KPMG's tax advice is not blameless, but . . . does not rise to the level of intentional or knowing conduct either."  (Appellant's Reply Br. at 17.)  Appellant's suggestion that *Blum* controls our decision in this case is unpersuasive.  Our decision to uphold a negligent underpayment penalty in *Blum* does not prove that Appellant's conduct in this case failed to rise above the level of negligence.  The fact that the conduct in *Blum* was sufficient to support a finding of negligence does not require us to find the bankruptcy court's finding of willful evasion in this case to be clearly erroneous.

Finally, Appellant argues the bankruptcy court's order "couched all of its criticism of [Appellant's] conduct with terms generally used to describe negligent

conduct." (Appellant's Reply Br. at 9.) Appellant particularly mentions the bankruptcy court's use of the terms "reasonably" and "known or should have known" as terms that he claims generally convey negligence rather than willfulness. While the bankruptcy court did use those terms in its opinion, it did not do so in a way suggesting Appellant's actions were merely negligent. Rather, in the context of the bankruptcy court's opinion as a whole, such language was simply used to express the bankruptcy court's conclusions that Appellant "must have been aware," *In re Vaughn*, 463 B.R. at 544, of the circumstances demonstrating the invalidity of his BLIPS losses, and that Appellant chose to claim those losses on his tax returns and to deplete his remaining assets, "knowing, as he must have, the BLIPS investment constituted an improper abusive tax shelter," *id.* at 547. Therefore, the language identified by Appellant as suggesting a negligence-based finding, when read in context, actually buttresses the bankruptcy court's finding that Appellant willfully attempted to evade his tax obligations.

## IV.

Ultimately, none of Appellant's arguments persuade us the bankruptcy court's determination that Appellant willfully attempted to evade his tax obligations is clearly erroneous. Appellant fails to demonstrate why we should not defer to the bankruptcy court's factual finding that Appellant willfully attempted to evade his tax liability under § 523(a)(1)(C). For the foregoing

reasons, we **AFFIRM** the district court's decision to affirm the order of the bankruptcy court.