**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM M. HAWKINS, III, AKA Trip Hawkins,<br><br>*Appellant*,<br><br>v.<br><br>THE FRANCHISE TAX BOARD OF CALIFORNIA; UNITED STATES OF AMERICA, INTERNAL REVENUE SERVICE,<br><br>*Appellees*. | No. 11-16276<br><br>D.C. No. 3:10-cv-02026-JSW<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
November 6, 2013—San Francisco, California

Filed September 15, 2014

Before: Andrew J. Kleinfeld, Sidney R. Thomas,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Thomas;
Dissent by Judge Rawlinson

## SUMMARY[*]

### Bankruptcy

The panel reversed the district court's affirmance of the bankruptcy court's judgment that a chapter 11 debtor's tax debts were excepted from discharge on the basis of his willful attempt to evade or defeat taxes under 11 U.S.C. § 523(a)(1)(C).

The panel held that, consistent with similar provisions in the Internal Revenue Code, 26 U.S.C. § 7201, specific intent is required for the discharge exception set forth in § 523(a)(1)(C) to apply. The panel remanded to the district court for re-evaluation under that standard.

Dissenting, Judge Rawlinson wrote that she would follow the lead of the Tenth Circuit and affirm the bankruptcy court ruling denying discharge of the debtor's substantial tax liability due to his willful attempt to avoid payment of those taxes through profligate spending.

### COUNSEL

Heinz Binder (argued) and Wendy Watrous Smith, Binder & Malter, LLP, Santa Clara, California, for Appellant.

Kathryn Keneally, Assistant Attorney General, Kathleen E. Lyon, Bruce R. Ellisen, William Carl Hankla, and Rachel I.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Wollitzer (argued), Attorneys, Tax Division, United States Department of Justice, Washington, D.C., for Appellee United States.

Lucy Wang, California Department of Justice, San Francisco, California, for Appellee State of California.

A. Lavar Taylor, Attorney and Adjunct Professor of Law, Chapman University School of Law, Santa Ana, California, for Amicus Curiae A. Lavar Taylor.

---

### OPINION

THOMAS, Circuit Judge:

In this case, we consider what mental state is required in order to find that a bankruptcy debtor's federal tax liabilities should be excepted from discharge under 11 U.S.C. § 523(a)(1)(c) because he "willfully attempted in any manner to evade or defeat such tax." Consistent with similar provisions in the Internal Revenue Code, 26 U.S.C. § 7201, we conclude that specific intent is required for the discharge exception to apply and remand to the district for re-evaluation under that standard.

### I

F. Scott Fitzgerald observed early in his career that the very rich "are different from you and me,"[1] to which Ernest

---

[1] F. SCOTT FITZGERALD, *The Rich Boy*, *in* The Short Stories of F. Scott Fitzgerald: A New Collection 317 (Matthew J. Bruccoli ed., Scribner 1989) (1926).

Hemingway later rejoined, "Yes, they have more money."[2] As with many bankruptcy cases involving the wealthy, our saga reads like a Fitzgerald novel, telling the story of acquisition and loss of the American dream, and the consequences that follow.

William M. "Trip" Hawkins designed and received an undergraduate degree in Strategy and Applied Game Theory from Harvard University, and an M.B.A. from Stanford University. After college, he became one of the earliest employees at Apple Computer, where he ultimately became Director of Marketing. He left Apple to co-found Electronic Arts, Inc. ("EA"), which became the world's largest supplier of computer entertainment software. Hawkins owned 20% of EA and served as its Chief Executive Officer. By 1996, his net worth had risen to $100 million. That year, he divorced his first wife, Diana, and married his second wife, Lisa. Tripp and Lisa purchased a $3.5 million home, where she cared for their two children and Tripp's two children from his first marriage. The IRS asserts they enjoyed the trappings of wealth, such as a private jet, expensive private schooling for the children, an ocean-side condominium in La Jolla, and a large private staff.

In 1990, EA created a wholly owned subsidiary, 3DO, for the purpose of developing and marketing video games and

---

[2] ERNEST HEMINGWAY, *The Snows of Kilimanjaro*, *in* THE SNOWS OF KILIMANJARO AND OTHER STORIES 23 (Scribner 1961) (1936). (Hemingway, quoting the critic Mary Colum without attribution, used Fitzgerald's name in the original magazine version of the short story, but altered the name to "Julian" in the later published book. *See* Eddy Dow, Letter to the Editor, *The Rich Are Different*, N.Y. TIMES, Nov. 13, 1988, *available at* http://www.nytimes.com/1988/11/13/books/l-the-rich-are-different-907188.html.)

game consoles. Hawkins left EA to run 3DO, which went public in 1993. Beginning in 1994, Hawkins sold large amounts of his EA stock to invest in 3DO. The capital gains from the sales were large: approximately $24 million in 1996, $3.8 million in 1997, and $39 million in 1998. His accountants, KPMG, advised him to shelter the gains in a Foreign Leveraged Investment Portfolio ("FLIP") and an Offshore Portfolio Investment Strategy ("OPIS"). Both strategies were designed to generate large paper losses to shield the EA capital gain from taxation.

To execute the FLIP transaction, Trip purchased shares of the Union Bank of Switzerland ("UBS") for $1.5 million and an option to acquire shares of Harbourtowne, Inc., a Cayman Islands corporation. Harbourtowne then contracted with UBS to purchase shares of UBS for $30 million, with UBS receiving an option to repurchase the shares before the sale closed. UBS exercised the option, and the UBS shares were never transferred to Harbourtowne. Hawkins then received a letter from KPMG stating that he could add to the tax basis of his UBS shares the $30 million that Harbourtowne had contracted to pay for its UBS shares. The opinion letter stated that UBS's repurchase of its shares would likely be considered a distribution to Harbourtowne (which was nontaxable because Harbourtowne was a foreign corporation), and that Harbourtowne's basis in its UBS shares should be treated as a transferred to Hawkins's basis in his UBS shares.

OPIS worked in a similar way. Hawkins purchased shares of UBS for $1.99 million and an option to acquire an interest in Hogue, Investors LP, a Cayman Islands limited partnership. Hogue contracted to purchase shares of UBS treasury stock, with UBS retaining a call option to repurchase

the shares before transfer. UBS exercised the option. KPMG issued an opinion letter to Hawkins stating that he could add the Hogue shares to his basis in the UBS stock.

Over the next several years, Hawkins then sold various quantities of the UBS stock and claimed losses of approximately $6 million on his 1996 federal tax return, $23.4 million on his 1997 return, $20.5 million on his 1998 return, $3.5 million on his 1999 return, and $8.2 million on his 2000 return.

In 2001, the IRS challenged the validity of the tax shelters and commenced an audit of Hawkins's 1997 return, which later expanded to include the 1998–2000 tax years. In 2002, the IRS sent Hawkins's attorney a letter stating that the losses from the FLIP and OPIS transactions would be disallowed. The subsequent audit report indicated that Hawkins owed additional taxes and penalties of $16 million for tax years 1997–2000.

During this period, the financial fortunes of 3DO deteriorated to the point where it needed a large capital infusion. Hawkins loaned 3DO approximately $12 million, but it was to no avail. 3DO filed a voluntary petition in bankruptcy under Chapter 11 seeking reorganization in 2003. It was later converted to a Chapter 7 liquidation, from which Hawkins never received a significant distribution.

Faced with these losses, Hawkins filed a motion in family court in 2003 to reduce the child support payments he was required to make to his first wife. He acknowledged that he owed $25 million to the IRS, had limited income, and was insolvent. The family court granted his request in part, but required him to place his assets in trust. During the family

court proceedings, Hawkins's attorney testified that Hawkins intended to discharge the tax debt in bankruptcy proceedings.

In 2005, the IRS made an aggregate assessment of taxes, penalties, and interest for tax years 1997–2000 that totaled $21 million.  The California Franchise Tax Board ("FTB") assessed $15.3 million in additional taxes, penalties, and interest for the same tax years.  Hawkins made an offer in compromise to the IRS of $8 million, which was rejected.

The bankruptcy court found that Hawkins and his wife did very little to alter their lavish lifestyle after it became apparent in 2003 that they were insolvent and that their personal living expenses exceeded their earned income.

In July 2006, Hawkins sold his primary residence and paid the entire $6.5 million net proceeds to the IRS.  A month later, the FTB seized $6 million from various financial accounts.  In September of that year, the Hawkinses filed a Chapter 11 bankruptcy petition, which the bankruptcy court found was for the primary purpose of dealing with their tax obligations.  Shortly after filing, Hawkins sold the La Jolla condominium for $3.5 million and paid the proceeds to the IRS.  Even after these payments and the seizure by the FTB, the IRS filed a proof of claim for $19 million and the FTB filed a claim for $10.4 million.

Hawkins proposed a liquidating plan of reorganization, which was confirmed by the bankruptcy court.  The IRS received a distribution of $3.4 million from the estate.  The confirmed plan discharged the Hawkinses from any debts that arose before the date of plan confirmation, but provided that the Hawkinses, IRS, or FTB could bring suit to determine whether the tax debts should be excepted from discharge.

The Hawkinses filed this declaratory action against the IRS and FTB seeking a determination that the unpaid taxes were covered by the discharge. The IRS and FTB counterclaimed, alleging that the tax debts were excepted from discharge pursuant to 11 U.S.C. § 523(a)(1)(c), which excepts from discharge any debt "with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax." The primary, but not exclusive, theory of the IRS and FTB was that the Hawkinses' maintenance of a rich lifestyle after their living expenses exceeded their income constituted a willful attempt to evade taxes. The bankruptcy court rejected most of the other government theories, but found that the Hawkinses' personal living expenses from January 2004 to September 2006 were "truly exceptional." The court estimated that the couples' personal expenses exceeded their earned income by $516,000 to $2.35 million during that period. Given these facts, the bankruptcy court concluded that, as to Trip Hawkins, the tax debts were excepted from discharge. However, as to Lisa Hawkins, the court held that the tax debts were discharged. The district court affirmed. This timely appeal followed.

II

Generally, a debtor is permitted to discharge all debts that arose before the filing of his bankruptcy petition. 11 U.S.C. § 727(b). However, the Bankruptcy Code provides for certain exceptions to that general rule. 11 U.S.C. § 523. Relevant to our case, the Code provides that a debtor may not discharge any tax debts "with respect to which the debtor made a fraudulent return *or willfully attempted in any manner to evade or defeat such tax*." 11 U.S.C. § 523(a)(1)(C) (emphasis added). As the district court correctly observed,

our Circuit has not yet construed this provision, nor determined what mental state is required.

We begin by using the usual tools of statutory construction, the first step of which is to determine whether the language has a plain and unambiguous meaning with regard to the particular dispute. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). In doing so, "we examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999). If the plain language is unambiguous, that meaning is controlling, and our inquiry is at an end. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877–78 (9th Cir. 2001) (en banc). If the statutory language is ambiguous, then we consult legislative history. *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999). "We also look to similar provisions within the statute as a whole and the language of related or similar statutes to aid in interpretation." *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013).

The key question in this case is the meaning of the word "willful" in the statute. Unfortunately, the plain words of the text do not answer that question because, as the Supreme Court has observed, "willful . . . is a word of many meanings, its construction often being influenced by its context." *Spies v. United States*, 317 U.S. 492, 497 (1943). Context matters in this case. The Bankruptcy Code is designed to provide a "fresh start" to the discharged debtor. *United States v. Sotelo*, 436 U.S. 268, 280 (1978). As a result, the Supreme Court has interpreted exceptions to the broad presumption of discharge narrowly. *See Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998). As we have observed "exceptions to discharge should be

limited to dishonest debtors seeking to abuse the bankruptcy system in order to evade the consequences of their misconduct." *Sherman v. SEC (In re Sherman)*, 658 F.3d 1009, 1015–16 (9th Cir. 2011), *abrogated on other grounds by Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754 (2013).

Thus, the "fresh start" philosophy of the Bankruptcy Code argues for a stricter interpretation of "willfully" than an expansive definition. Significantly, the Supreme Court recognized the Code's "fresh start" object and policy in construing the word "willfully" in considering a related discharge exception in *Kawaauhau*. In *Kawaauhau*, the creditors requested the Bankruptcy Court to hold a medical malpractice claim to be non-dischargeable under 11 U.S.C. § 523(a)(6), which provides that a "discharge [in bankruptcy] . . . does not discharge an individual debtor from any debt . . . for willful and malicious injury . . . to another." 523 U.S. at 59–61. The Supreme Court noted that, because the word "willful" modifies the word "injury" in § 523(a)(6), "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury" was required to establish non-dischargeability. *Id.* at 61. The Supreme Court analogized "willful" as the mental state required for intentional torts, not for negligent acts. *Id.*

The structure of the statute also supports a narrow construction of "willfully." The discharge exception at issue, § 523(a)(1), lists tax and customs debts warranting exception in three categories. Under § 523(a)(1)(A), numerous types of debts are excepted from discharge on a strict liability basis. Under § 523(a)(1)(B), tax debts for which a return was not filed or was filed late may not be discharged. Section 523(a)(1)(C) is the grouping at issue here: no discharge is permitted for tax debts "with respect to which the debtor

made a fraudulent return or willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C).  The grouping of the fraudulent return offense with the evasion offense in subsection (C)—rather than with the other offenses involving tax returns in subsection (B)—suggests that it is more akin to attempted tax evasion than to failing to file a timely return.  If a willful attempt to evade taxation requires mere knowledge of the tax consequences of an act, and no bad purpose, then it is difficult to see how such acts resemble the filing of a fraudulent return.  By contrast, if a willful attempt requires bad purpose, then such acts are naturally grouped with other acts requiring bad purpose, such as filing a fraudulently false return.

Not only does the structure of the statute as a whole, including its "object and policy," indicate that the term "willfully" is to be narrowly construed, but that interpretation is supported by legislative history.  Section 523(a)(1) is described in the Congressional Record as a "compromise" between the House and Senate versions of a bill.  124 Cong. Rec. 32,398 (1978).  The House version contained the "willfully" language, H.R. Rep. No. 95-595, at 363 (1977), while the Senate version instead excepted tax debts for which the debtor "*fraudulently* attempted to evade" the tax, S. Rep. No. 95-989, at 78 (1978) (emphasis added).  If the meaning of the Senate's language was so drastically reduced as to remove any bad purpose from the exception for attempted tax evasion, it is surprising that such a change was not thought significant enough to warrant mention in the Congressional Record.

A narrow interpretation of "willfully" is also in accord with case precedent that generally except tax debts from discharge under § 523(a)(1)(C) only when the conduct

amounting to attempted tax evasion is of a type likely to be accompanied by an evasive motivation. Acts found by other circuits to constitute "willful[] attempt[s]" include declining to file tax returns, shifting assets to another person or a false bank account, shielding assets, and switching all financial dealings to cash. *See, e.g.*, *Vaughn v. Comm'r (In re Vaughn)*, __ F.3d __, 2014 WL 4197347, at *6 n.5 (10th Cir. 2014) (purchase and transfer of a house to girlfriend; establishment and transfer of funds to a trust for a step-daughter); *United States v. Coney*, 689 F.3d 365, 377 (5th Cir. 2012) (concealment of currency transactions); *In re Gardner*, 360 F.3d 551, 558 (6th Cir. 2004) (concealment of assets through special bank accounts); *United States v. Fretz (In re Fretz)*, 244 F.3d 1323, 1329 (11th Cir. 2001) (failure to file tax returns); *Tudisco v. United States (In re Tudisco)*, 183 F.3d 133, 137 (2d Cir. 1999) (failure to file returns); *United States v. Fegeley (In re Fegeley)*, 118 F.3d 979, 984 (3d Cir. 1997) (failure to file returns); *In re Birkenstock*, 87 F.3d 947, 951–52 (7th Cir. 1996) (failure to file returns and attempt to conceal income); *Dalton v. IRS*, 77 F.3d 1297, 1302 (10th Cir. 1996) (concealment of asset ownership). With the exception of the mere failure to file a return, these same acts satisfy the conduct requirement for criminal tax evasion in this Circuit. *See United States v. Carlson*, 235 F.3d 466, 468–69 (9th Cir. 2000).

A specific intent construction of "willfully" in the bankruptcy tax context is also supported by the Internal Revenue Code. In language almost identical to that used in § 523(a)(1)(C), the Internal Revenue Code makes it a felony to "willfully attempt[] in any manner to evade or defeat any tax." 26 U.S.C. § 7201. The specific intent required for felonious tax evasion "requires the Government to prove that the law imposed a duty on the defendant, that the defendant

knew of this duty, and that he voluntarily and intentionally violated that duty," *United States v. Bishop*, 291 F.3d 1100, 1106 (9th Cir. 2002) (internal quotation marks omitted); that is, a "voluntary, intentional violation of a known legal duty," *Cheek v. United States*, 498 U.S. 192, 201 (1991) (internal quotation marks omitted). *See also Edwards v. United States*, 375 F.2d 862, 867 (9th Cir. 1967) (interpreting the provision to require "willfulness in the sense of a specific intent to evade or defeat the tax or its payment"). The Supreme Court has clarified that such an attempt "almost invariably" will "involve[] deceit or fraud upon the Government, achieved by concealing a tax liability or misleading the Government as to the extent of the liability." *Kawashima v. Holder*, 132 S. Ct. 1166, 1175, 1177 (2012). If attempted evasion under § 523(a)(1)(C) is interpreted in a similar manner, then it would require fraudulent, or at least specific, intent.

Similarly, in *Spies*, the Court considered the difference between the misdemeanor of willfully failing to pay a tax or file a timely return (§ 7203) with the felony of willfully attempting to evade or defeat a tax or its payment (present § 7201). 317 U.S. at 498. The Supreme Court rejected the government's contention, which is similar to the one it takes in this case, that a willful failure to file a return, coupled with a willful failure to pay the tax, constituted a willful attempt to evade or defeat a tax in violation of § 7201. *Id.* at 499. Rather, it interpreted the statute as requiring some "willful commission in addition to willful omissions." *Id.* It then provided some examples of qualifying acts, including keeping double books, making false bookkeeping entries, destruction of records, concealment of assets, along with "any kind of conduct, the likely effect of which would be to mislead or conceal." *Id.* Applying the logic of *Spies*, which was construing language almost identical to the phrase at issue,

simply spending beyond one's income would not qualify as a "willful[] attempt[] in any manner to evade or defeat such tax."

Given the structure of the statute as a whole, including its object and policy, legislative history, case precedent, and analogous statutes, we conclude that declaring a tax debt non-dischargeable under 11 U.S.C. § 523(a)(1)(C) on the basis that the debtor "willfully attempted in any manner to evade or defeat such tax" requires a showing of specific intent to evade the tax. Therefore, a mere showing of spending in excess of income is not sufficient to establish the required intent to evade tax; the government must establish that the debtor took the actions with the specific intent of evading taxes. Indeed, if simply living beyond one's means, or paying bills to other creditors prior to bankruptcy, were sufficient to establish a willful attempt to evade taxes, there would be few personal bankruptcies in which taxes would be dischargeable. Such a rule could create a large ripple effect throughout the bankruptcy system. As to discharge of debts, bankruptcy law must apply equally to the rich and poor alike, fulfilling the Constitution's requirement that Congress establish "uniform laws on the subject of bankruptcies throughout the United States." U.S. Const., art. I, § 8, cl. 4.

Some of our sister circuits have read 11 U.S.C. § 523(a)(1)(C) differently, interpreting the statute to require the government to show that the debtor "(1) had a duty to pay taxes under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated that duty." *Vaughn*, 2014 WL 4197347 at \*6; *Coney*, 689 F.3d at 371; *Gardner*, 360 F.3d at 558; *Fretz*, 244 F.3d at 1330; *Fegeley*, 118 F.3d at 984; *Birkenstock*, 87 F.3d at 952; *Dalton*, 77 F.3d at 1300.

To the extent that these cases can be construed, as the government does, as holding that a tax debt can be considered dischargeable if the acts were committed intentionally, but not necessarily for the purpose of evading taxation, we respectfully disagree. However, most of the cases involve intentional acts or omissions designed to evade taxes, such as criminal structuring of financial transactions to avoid currency reporting requirements (*Coney*, 689 F.3d at 369); concealing assets through nominee accounts (*Vaughn*, 2014 WL 4197347 at \*6; *Gardner*, 360 F.3d at 559; *Birkenstock*, 87 F.3d at 952); concealing ownership in assets (*Vaughn*, 2014 WL 4197347 at \*6; *Dalton*, 77 F.3d at 1302); and failing to file tax returns and pay taxes (*Fretz*, 244 F.3d at 1329; *Fegeley*, 118 F.3d at 984). These actions are not inconsistent with a specific intent requirement. And, although lavish lifestyle and ability to pay taxes have been mentioned by some Circuits, *see, e.g.*, *Vaughn*, 2014 WL 4197347 at \*6, no Circuit has held that living beyond one's means alone constitutes willful tax evasion, and no circuit has held that failure to pay taxes, by itself, constitutes willful tax evasion within the meaning of that clause in § 523(a)(1)(C).

## III

Absent circuit law on this question, the district and bankruptcy courts held that specific intent to evade taxes was not required in order to except a tax debt from discharge under 11 U.S.C. § 523(a)(1)(C) and relied in large part on the Hawkinses' spending beyond their income as the basis for denying tax debt discharge. Aside from the KPMG transactions, most of the expenditures on which the government relies were made consistent with Hawkins's past spending practices, and investments were made in property that would be subject to tax liens. As far as the record

discloses thus far, there were no financial transfers into nominee accounts or concealment of assets, although the government claims that some funds ordered paid into trust by the family court were done so with the intent of tax evasion.

The government rightly points out that there were other facts that supported a finding of a willful failure to evade taxes that were cited as part of the decisions. However, given the heavy reliance on lifestyle choices in the decisions, it is not possible for us to determine if the district or bankruptcy court decisions would have been different without that consideration, and we decline to evaluate the other evidence tendered by the government in the first instance on appeal. Because neither the district court nor the bankruptcy court had the benefit of our conclusion that denial of discharge for "willfully attempt[ing] in any manner to evade or defeat" a tax debt requires that the acts be taken with the specific intent to evade the tax, we vacate the judgment and remand so that the courts can reanalyze the case using the specific intent standard. We need not, and do not, reach any other issue urged by the parties. Each party shall bear its or their own costs on appeal.

**REVERSED AND REMANDED.**

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent. I agree with the majority that the rich are different in many ways, but that difference should not include an unfettered ability to dodge taxes with impunity.

There is little doubt, if any, that William Hawkins deliberately decided to spend money extravagantly rather than pay his duly assessed state and federal taxes. Hawkins now seeks to discharge these taxes in bankruptcy.

The Bankruptcy Code precludes discharge of tax debts "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). We must now decide whether Hawkins' actions avoiding payment of the taxes was "willful." I disagree with the majority on this point.

The proceedings before the bankruptcy court are telling. There is no question that Hawkins was aware of the substantial sums he owed in taxes as early as 2004. *See Bankruptcy Court Memorandum Decision*, p. 7 (noting that during family court proceedings to reduce child support payments, Hawkins acknowledged owing $25 million in taxes). Even after acknowledging the tax debt, Hawkins maintained a home worth well over $3.5 million, and an ocean-view condominium worth well over $2.6 million. *See id*., pp. 9–10. Although there were only two drivers in the family, Hawkins purchased a fourth vehicle that cost $70,000.00. *See id*., p. 10. At the family court hearing, Hawkins' bankruptcy attorney "testified that Hawkins' *intent was not to pay the tax debt*, but to discharge it in bankruptcy. . . ." *Id*., p. 19. This testimony is a strong indication of a willful intent to avoid the payment of taxes by hook or by crook. Indeed, the bankruptcy court noted that the personal living expenses of the Hawkins family during the period in question were "truly exceptional." *Id*., p. 20. Incredibly, the family "spent between $16,750 and $78,000 more" each month than their income. *Id*. The bankruptcy court determined that the wasting of assets through profligate

spending indicated willful evasion of tax payments. *See id.*, p. 27. Ultimately, the bankruptcy court relied upon the following "badges of evasion": 1) Hawkins' "exceptional business sophistication"; 2) his "open acknowledgment of his tax debt and insolvency"; 3) the lengthy period of wasteful spending; 4) the amount of wasteful spending; and 5) "the extent to which the wasteful expenditures exceeded . . . earned income." *Id.*, p. 29.

The majority opinion gives Hawkins a pass by focusing on the Bankruptcy Code's purpose of providing a "fresh start" to debtors. However, this overly expansive interpretation of the "fresh start" policy could easily eclipse all discharge exceptions. The majority's conclusion, in my view, creates a circuit split and turns a blind eye to the shenanigans of the rich.

I am persuaded by the reasoning of a recent decision in the Tenth Circuit involving similar circumstances, *Vaughn v. IRS (In re Vaughn)*, No. 13-1189, 2014 WL 4197347 (10th Cir. Aug. 26, 2014). In that case, the Tenth Circuit cited to the district court decision in this case to support its ruling. *See id.* at \*6 (citing *Hawkins v. Franchise Tax Bd.*, 447 B.R. 291, 300 (N.D. Cal. 2011). In *Vaughn*, as in *Hawkins*, a wealthy taxpayer sought to discharge through bankruptcy a substantial amount of taxes owed. *See id.* at \*4.

The Tenth Circuit held that the determination of "whether or not a debtor willfully attempted to evade or defeat a tax under 11 U.S.C. § 523(a)(1)(C) is a question of fact reviewable for clear error. . . ." (citation, footnote, reference and alterations omitted). *Id.* at \*6. The court articulated the following elements required to satisfy the mental state requirement: "1) the debtor had a duty under the law; 2) the

debtor knew he had the duty; and 3) the debtor voluntarily and intentionally violated the duty." *Id*. (citing *Vaughn v. IRS (In re Vaughn)*, 463 B.R. 531, 546 (Bankr. D. Colo. 2011); *Hawkins*, 447 B.R. at 300).

The Tenth Circuit incorporated a number of findings from the bankruptcy court to support the conclusion that Vaughn acted willfully to evade taxes, including failure to preserve assets despite knowledge of substantial tax liability, and "numerous large expenditures." *Id*. n.5.[1] The Tenth Circuit also adopted the observation made in *Hawkins* that "nonpayment of a tax can satisfy the conduct requirement when paired with even a single additional culpable act or omission." *Id*. (quoting *Hawkins*, 447 B.R. at 301).

I would follow the lead of the Tenth Circuit and affirm the bankruptcy court ruling denying discharge of Hawkins' substantial tax liability due to his willful attempt to avoid payment of those taxes through profligate spending. The bankruptcy court's findings were not clearly erroneous and were consistent with the persuasive rationale articulated by the Tenth Circuit in *Vaughn*. Providing a fresh start under the Bankruptcy Code should not extend to aiding and abetting wealthy tax dodgers. I respectfully dissent.

---

[1] Notably, these same findings also were made by the bankruptcy court in this case.