FILED

APR 17 2018

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**
**OF THE NINTH CIRCUIT**

In re:                              )   BAP No.   SC-17-1126-FBL
                                    )             SC-17-1223-FBL
CHRISTOPHER JOHN HAMILTON and )             (Related)
ELIZABETH LEIGH TESOLIN,            )
                                    )   Bk. No.   14-03142-CL11
            Debtors.                )
_____)   Adv. Pro. 14-90152-CL
                                    )
CHRISTOPHER JOHN HAMILTON,          )
                                    )
            Appellant,              )
                                    )
v.                                  )   **OPINION**
                                    )
ELITE OF LOS ANGELES, INC.;         )
SAN DIEGO TESTING SERVICES,         )
INC.; ELIZABETH LEIGH TESOLIN,      )
                                    )
            Appellees.              )
_____)
                                    )
ELITE OF LOS ANGELES, INC.;         )
SAN DIEGO TESTING SERVICES,         )
INC.,                               )
                                    )
            Appellants,             )
                                    )
v.                                  )
                                    )
CHRISTOPHER JOHN HAMILTON;          )
ELIZABETH LEIGH TESOLIN,            )
                                    )
            Appellees.              )
_____)

Argued and Submitted on March 22, 2018
at Pasadena, California

Filed – April 17, 2018

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Christopher B. Latham, Bankruptcy Judge, Presiding

Appearances:   Paul J. Leeds of Higgs Fletcher & Mack LLP argued

for appellants/appellees Christopher John Hamilton and Elizabeth Leigh Tesolin; Susan C. Stevenson of Pyle Sums Duncan & Stevenson, APC argued for appellees/appellants Elite of Los Angeles, Inc. and San Diego Testing Services, Inc.

Before: FARIS, BRAND, and LAFFERTY, Bankruptcy Judges.

FARIS, Bankruptcy Judge:

## INTRODUCTION

Appellees Elite of Los Angeles, Inc. ("Elite") and San Diego Testing Services, Inc. ("SDTS") (collectively, "Elite Entities") are in the business of providing educational advising and tutoring services. Christopher John Hamilton was an officer and part-owner of SDTS. With the help of his wife, Elizabeth Leigh Tesolin, and others, he opened a competing business and absconded with the Elite Entities' lesson plans, proprietary information, and teachers. The Elite Entities obtained a $2 million state court judgment against Mr. Hamilton and Ms. Tesolin (collectively "Debtors"), who then sought chapter 11[1] bankruptcy protection. The bankruptcy court determined that the judgment was nondischargeable under § 523(a)(6).

The Debtors appeal the nondischargeability judgment, arguing that the bankruptcy court ignored Supreme Court precedent and misapplied Ninth Circuit law. We AFFIRM.

Separately, the Elite Entities appeal from the bankruptcy court's order disallowing some of the postjudgment interest on

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

the state court judgment. The bankruptcy court should have awarded the Elite Entities postjudgment interest at the state rate. We REVERSE and REMAND.

## FACTUAL BACKGROUND

**A. Prelitigation events**

The Elite Entities provide academic counseling, tutoring, and college preparatory and standardized test prep services to high school students. In 1999, Mr. Hamilton joined Elite as a faculty member. In 2006, Elite formed a sister company, SDTS, and Mr. Hamilton became a shareholder, officer, and director of SDTS.

After a few years, Mr. Hamilton grew discontented with the Elite Entities. In 2011, he retained a law firm to advise him on separating from the Elite Entities and forming his own company.

In September 2011, while still an officer and director of SDTS, Mr. Hamilton formed Summa Consulting, LLC ("Summa"), an academic counseling and tutoring company. He also began gathering the Elite Entities' proprietary information with the assistance of other SDTS employees and his wife, Ms. Tesolin. For example, he took employee personnel files, student records, teaching materials and lesson plans, curriculum development tools, and a copy of the data on SDTS's server. He also began undermining SDTS's prospective business by discouraging potential students from enrolling at SDTS and diverting them to Summa's programs.

On October 6, 2011, without any prior notice, Mr. Hamilton resigned from SDTS. That same day, he used the Elite Entities' confidential contact list to send e-mails notifying SDTS's

3

clients of his departure and soliciting business for Summa. Over the next two weeks, several other employees left SDTS to join Mr. Hamilton at Summa, leaving only one employee remaining at SDTS.

**B.    State court lawsuit**

Shortly thereafter, the Elite Entities filed suit in state court against the Debtors, Summa, and other former SDTS employees, asserting causes of action for breach of fiduciary duty, breach of duty of loyalty, intentional interference with prospective economic advantage, trade secret misappropriation, unfair competition, aiding and abetting, violation of California Penal Code § 502, and unjust enrichment. The complaint sought damages totaling $7.7 million and punitive damages against Mr. Hamilton.

Following a trial, the jury returned two special verdicts in the Elite Entities' favor. In relevant part, it found Mr. Hamilton liable for $2,070,000 for breach of fiduciary duty, breach of duty of loyalty, intentional interference with prospective economic advantage, trade secret misappropriation, and punitive damages. It also found Ms. Tesolin jointly and severally liable for $1,855,000 under an aiding and abetting theory (collectively, "State Court Judgment").

**C.    Bankruptcy case and adversary proceeding**

On the day of a scheduled sheriff's sale of Mr. Hamilton's stock in SDTS, the Debtors filed their chapter 11 petition. The Elite Entities filed proofs of claim based on the debt arising from the State Court Judgment.

The Elite Entities also filed an adversary complaint against the Debtors, seeking a determination that the State Court

4

Judgment was nondischargeable under § 523(a)(6). They asserted that each of the causes of action for which the Debtors were found liable constituted a willful and malicious injury that was nondischargeable.

The Debtors and the Elite Entities filed cross-motions for summary judgment. The Elite Entities argued that the bankruptcy court should apply issue preclusion to the State Court Judgment and hold that the entire debt was nondischargeable. In response, the Debtors agreed that the jury's factual findings had preclusive effect, but contended that the unintentional torts lacked the requisite element of intent and the corresponding damages were dischargeable debts.

The bankruptcy court granted the Elite Entities summary judgment on the intentional interference with prospective economic advantage claim because the Debtors conceded that the State Court Judgment necessarily established willful and injurious intent. It thus held that the corresponding $160,000 award was nondischargeable as to the Debtors jointly and severally. It initially held that the jury's special verdict satisfied the issue of malice on all causes of action. However, the bankruptcy court later reconsidered its ruling and held that the jury did not allocate punitive damages to any particular cause of action, so it was improper to infer that Mr. Hamilton acted with requisite malice. It also denied the Elite Entities' request concerning postjudgment interest and directed them to file a separate motion.

**D.   Trial and nondischargeability judgment**

The bankruptcy court conducted a four-day trial to determine

5

whether the remaining debt was nondischargeable. Following trial, the bankruptcy court issued its memorandum decision holding that the State Court Judgment was nondischargeable under § 523(a)(6). It considered whether the Elite Entities had satisfied § 523(a)(6)'s "willful and malicious injury" test laid out in Kawaauhau v. Geiger, 523 U.S. 57 (1998), and Petralia v. Jercich (In re Jercich), 238 F.3d 1202 (9th Cir. 2001).

First, it ruled that Mr. Hamilton had acted willfully. It noted that, under Jercich, willfulness is satisfied if the defendant either (1) had a subjective motive to inflict injury upon them, or (2) believed that injury was substantially certain to result from his conduct. It found that the Elite Entities had not shown that Mr. Hamilton had a subjective motive to injure them.

Rather, the court ruled that the Elite Entities successfully established that Mr. Hamilton believed that injury was substantially certain to result from his conduct. It found that "it is readily apparent that Mr. Hamilton's conduct caused substantial harm. He was a central, executive-level employee and departed without notice. And he took several key employees with him." Mr. Hamilton also carefully orchestrated his departure with his wife and other SDTS employees and took the Elite Entities' best teachers, proprietary information (including e-mail contact list and client database), tangible property, and SDTS's hard drive. Moreover, due to Mr. Hamilton's "significant premeditation," the Elite Entities' "ability to conduct business was markedly impeded. And Mr. Hamilton's conduct badly disrupted Elite's business. There was immediate disorder . . . .

6

Plaintiffs' upper management did not know who had the keys to the building." The court concluded that Mr. Hamilton

> knew with substantial certainty that his conduct would result in harm to Plaintiffs. Aside from inference, the court's conclusion is based on reason: What he was doing simply **had** to be harmful. For example, in his September 26, 2011 e-mail to his father, Mr. Hamilton described his impending resignation as his "own personal D-Day" and that he would be "pull[ing] the pin" on October 1, 2011. . . . This conjures up images of massive damage being inflicted. Further, there was evidence concerning a "coup" - presumably against Plaintiffs' leadership to harm it or deprive it of control. And Mr. Hamilton's October 8, 2011 e-mail discusses an upcoming meeting with attorneys in Los Angeles to discuss "fold[ing] up the old entity." . . . This suggests that Mr. Hamilton expected Elite or SDTS would cease to exist, or at least to function, as a business entity. Mr. Hamilton's efforts in testimony to convince the court that this was just meant to resolve his ownership in SDTS, i.e., that he would buy out Mr. Park and Mr. Sung or vice versa, is not credible and the court rejects it.

(Emphasis in original.) Accordingly, the Elite Entities established that Mr. Hamilton acted willfully.

Second, the court ruled that Mr. Hamilton acted with malice. It rejected Mr. Hamilton's argument that he established "just cause or excuse" because he had sought and relied on the advice of counsel in good faith to lawfully separate from the Elite Entities and start Summa.

Third, the court found that Mr. Hamilton's conduct was tortious because it implicated torts under California law.

Finally, the court determined that Mr. Hamilton's liability to the Elite Entities was nondischargeable under § 523(a)(6). But the court held that there was insufficient evidence to establish the nondischargeability of Ms. Tesolin's debt, and, as a result, only the $160,000 joint and several judgment arising from the intentional interference with prospective economic

7

advantage claim was nondischargeable as to Ms. Tesolin.

The Debtors timely filed a notice of appeal from the judgment ("Nondischargeability Judgment").[2]

**E.    Motion for postjudgment interest**

Following the entry of the Nondischargeability Judgment, the Elite Entities moved for a nondischargeability determination on postjudgment interest accruing on the State Court Judgment ("Postjudgment Interest Motion").  They sought a determination that postjudgment interest was nondischargeable and accrued at the California rate of ten percent from the date of entry of the State Court Judgment pursuant to California Code of Civil Procedure § 685.010.  They argued that it is well settled in the Ninth Circuit that prepetition, nondischargeable debts accrue interest postpetition.

In opposition, the Debtors argued that, because an adversary proceeding is a federal matter brought under a federal statute (and a nondischargeability claim is solely a federal question), the court must apply the federal interest rate.

Following a hearing, the bankruptcy court entered an order ("Postjudgment Interest Order") granting in part and denying in part the Postjudgment Interest Motion.  The court thought that there were four relevant time periods: (1) between the State Court Judgment and the petition date ("Period One"); (2) between

---

[2] After the Debtors appealed from the Nondischargeability Judgment, they filed a motion to dismiss Ms. Tesolin from the appeal.  A BAP motions panel granted the motion but designated Ms. Tesolin as an appellee out of an abundance of caution, in the event that the appellate decision affects the $160,000 stipulated judgment.

8

the petition date and the adversary complaint ("Period Two"); (3) between the adversary complaint and the Nondischargeability Judgment ("Period Three"); and (4) the time after entry of the Nondischargeability Judgment ("Period Four").

The Debtors conceded that the ten percent California rate applied to Period One. The court stated that "[i]nherent in the judgment was the statutory 10% interest right; it is a substantive aspect of Plaintiff's prepetition claim. It is thus integral to the nondischargeable State Court Judgment and is likewise **nondischargeable**." (Emphasis in original.)

Second, the court held that the state rate was applicable to Period Two, which was the short postpetition, pre-complaint period. It held that the postjudgment interest that was accruing following the State Court Judgment properly continued to accrue, and any interest before the adversary complaint was filed "was part and parcel of the liability arising from the State Court Judgment."

Third, the court disallowed any interest during Period Three, which lasted for three years while the adversary complaint was pending. It noted that "[t]he Complaint's filing vested the court with sound discretion to award prejudgment interest." It analyzed the "equities, fairness, and what it will take to make Plaintiffs whole." It reasoned:

> Plaintiffs earned a handsome return on the State Court Judgment while it accrued interest at the state rate. This amply protected the time value of the money at stake. But to allow that to continue past the Complaint's filing date strikes the court as punitive. Prejudgment interest is an element of compensation, not a penalty. To be sure, Defendants behaved badly. But having a large nondischargeability judgment is significant punishment already. To allow three more

9

years of state-rate interest – let alone post-judgment at that rate for all time – is inequitable. How could Defendants ever hope to pay off this debt if it continues accruing interest at 10%? The court views this is [sic] an intolerable burden, one so extreme that it threatens to deny Defendants any semblance of a fresh start.

It thus stated that the Elite Entities were not entitled to any "prejudgment" interest during Period Three.

Finally, for the same reasons, the court exercised its discretion to award the Elite Entities "postjudgment" interest at the federal rate for Period Four.

The Elite Entities timely appealed the Postjudgment Interest Order.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and (2)(I). We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

(1) Whether the bankruptcy court erred in determining that the State Court Judgment was nondischargeable under § 523(a)(6).

(2) Whether the bankruptcy court erred in disallowing postjudgment interest on the State Court Judgment.

**STANDARDS OF REVIEW**

We apply de novo review to the bankruptcy court's construction of § 523(a)(6) and the law governing pre- and postjudgment interest. The clear error standard applies to the bankruptcy court's factual findings about the Debtors' mental state. Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002) ("We review the bankruptcy court's conclusions of law de novo and its factual findings for clear error.").

10

De novo review is independent and gives no deference to the trial court's conclusion. Roth v. Educ. Credit Mgmt. Agency (In re Roth), 490 B.R. 908, 915 (9th Cir. BAP 2013).

A finding of fact is clearly erroneous if it is illogical, implausible, or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). The bankruptcy court's choice among multiple plausible views of the evidence cannot be clear error. United States v. Elliott, 322 F.3d 710, 715 (9th Cir. 2003).

## DISCUSSION

**A. The bankruptcy court correctly applied § 523(a)(6).**

**1. Jercich is controlling Ninth Circuit law.**

Mr. Hamilton argues that the bankruptcy court misconstrued § 523(a)(6)'s "willful" injury requirement by ignoring the Supreme Court's decision in Geiger in favor of the Ninth Circuit's decision in Jercich. These two cases are not at odds, and we find no error in the bankruptcy court's reliance on Jercich.

Section 523(a)(6) excepts from discharge any debt arising from "willful and malicious injury by the debtor to another entity or to the property of another entity[.]" § 523(a)(6). The creditor must prove both willfulness and malice. Ormsby v. First Am. Title Co. of Nev. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010). "A 'willful' injury is a 'deliberate or intentional **injury**, not merely a deliberate or intentional **act** that leads to injury.'" Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702, 706 (9th Cir. 2008) (quoting Geiger, 523 U.S. at 61) (emphases in original). The Ninth Circuit has

11

instructed that the willful injury requirement under § 523(a)(6) "is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." In re Ormsby, 591 F.3d at 1206.

In Geiger, the Supreme Court considered whether a debt arising from a judgment attributable to negligent or reckless conduct falls within the "willful and malicious injury" exception to discharge. 523 U.S. at 59. It declined to expand the definition of "willful" to include the negligent or reckless medical care at issue in that case. Instead, it stated:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional **injury**, not merely a deliberate or intentional **act** that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury."

Id. at 61 (emphasis in original).

Three years after Geiger, the Ninth Circuit decided Jercich, which also construed § 523(a)(6)'s "willful" injury requirement. The court rejected the contention that, under Geiger, the willfulness prong necessarily required a "specific intent" to cause injury. 238 F.3d at 1207. It stated that Geiger "clarified that it is insufficient under § 523(a)(6) to show that the debtor **acted** willfully and that the injury was negligently or recklessly inflicted; instead, it must be shown not only that the debtor **acted** willfully, but also that the debtor inflicted the **injury** willfully and maliciously rather than recklessly or negligently." Id. (emphasis in original). But Geiger "did not answer the question before us today — the precise state of mind

12

required to satisfy § 523(a)(6)'s 'willful' standard." Id.

The Ninth Circuit relied on two authorities cited in the Geiger decision: McIntyre v. Kavanaugh, 242 U.S. 138 (1916), and Restatement (Second) of Torts § 8A. It noted that, under McIntyre, "a wrongful act that is voluntarily committed with knowledge that the act is wrongful and will necessarily cause injury meets the 'willful and malicious' standard of § 523(a)(6)." 238 F.3d at 1208.[3] Similarly, it stated that the Restatement's definition of the term "intent" "requires the actor either to desire the consequences of an act or to know the consequences are substantially certain to result." Id.

Based on authority from the Fifth and Sixth Circuits and the Ninth Circuit BAP, the court held that, "under Geiger, the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury **or that the debtor believed that injury was substantially certain to occur as a result of his conduct**." Id. (emphasis added). It noted that "this holding comports with the purpose [of] bankruptcy law's fundamental policy of granting discharges only to the honest but unfortunate debtor." Id.

In the present case, Mr. Hamilton argues that the bankruptcy court erred by relying on Jercich because it runs afoul of Geiger. We disagree.

---

[3] McIntyre was decided pre-Bankruptcy Code, but it construed a section of the prior Bankruptcy Act which provided exceptions to discharge for "liabilities . . . for wilful and malicious injuries to the person or property of another . . . ." McIntyre, 242 U.S. at 139-40. Because the relevant language of the Bankruptcy Code and Bankruptcy Act is identical, the Supreme Court's pre-Code decision is still instructive.

13

While Mr. Hamilton is correct that we are bound to follow Supreme Court precedent, we are also bound by the Ninth Circuit's decisions. See Mano-Y&M, Ltd. v. Field (In re Mortg. Store, Inc.), 773 F.3d 990, 995-96 (9th Cir. 2014) ("our decisions are binding precedent that the BAP must follow"); In re Brooks-Hamilton, 400 B.R. 238, 257 n.27 (9th Cir. BAP 2009) (Markell, J., concurring) ("we do not have the power or authority to ignore binding Ninth Circuit or Supreme Court precedent"). The Ninth Circuit has instructed that:

> Binding authority within this regime cannot be considered and cast aside; it is not merely evidence of what the law is. Rather, caselaw on point **is** the law. If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect. Binding authority must be followed unless and until overruled by a body competent to do so.

Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001) (emphasis in original). Even if we disagreed with Jercich, the Ninth Circuit's decision is binding on us until it is reversed: "Once a [circuit] panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court." Id. at 1171.

Moreover, Jercich does not contradict Geiger. Mr. Hamilton argues that Geiger requires "actual intent" or "specific intent" and that Jercich's "substantial certainty" prong does away with those requirements and expands on an exception to discharge. The Supreme Court determined that willfulness under § 523(a)(6) requires an intent to cause harm (as opposed to harm caused unintentionally), but it did not, as Jercich noted, elaborate on "the precise state of mind required to satisfy § 523(a)(6)'s

14

'willful' standard." 238 F.3d at 1207. <u>Jercich</u> and cases from other circuits with similar holdings are the natural elaboration of the principles laid out in <u>Geiger</u>.

Mr. Hamilton relies extensively on the Ninth Circuit's decision in <u>Hawkins v. Franchise Tax Board of California</u>, 769 F.3d 662 (9th Cir. 2014), for the proposition that willfulness requires "specific intent." But <u>Hawkins</u> concerned only tax debts under § 523(a)(1)(A), not willful and malicious injury under subsection (a)(6). The Ninth Circuit only recognized the "specific intent" requirement in "the bankruptcy tax context." 769 F.3d at 668. Although the decision mentions <u>Geiger</u>, it does so only for the proposition that "[t]he Supreme Court analogized 'willful' as the mental state required for intentional torts, not for negligent acts." <u>Id.</u> at 667. It does not explain or expand on <u>Geiger</u>'s holding, nor does it implicitly overrule <u>Jercich</u>, as Mr. Hamilton contends.

Accordingly, <u>Jercich</u> is good law, and we must follow it.

**2.** **The bankruptcy court properly applied <u>Jercich</u> and <u>Geiger</u>.**

We similarly are unpersuaded by Mr. Hamilton's alternative argument that the court misapplied <u>Jercich</u>.

Mr. Hamilton argues that he "knew his departure would cause some disruption - just as the lawful departure of any high-level employee necessarily interrupts business as usual - but he neither intended nor understood that it would injure Elite and SDTS to the tune of $2 million." In other words, he claims that the injury was not willful because, although he knew that he would cause the Elite Entities some harm, he did not know the

15

full extent of the final damages.

But the bankruptcy court found not only that Mr. Hamilton knew that his conduct would result in "some harm," but also that he understood with "substantial certainty" the gravity of his actions. It found that he caused "substantial harms" by departing with several key employees without notice, taking the Elite Entities' proprietary information and tangible property, and leaving SDTS in confusion and disarray, such that the Elite Entities did not even have keys to the building. The court found that "[w]hat he was doing simply **had** to be harmful." (Emphasis in original.) It noted that Mr. Hamilton described his departure as his "own personal D-Day," "pulling the pin," a "coup," and "folding up the old entity." The court found that the evidence suggested that "Mr. Hamilton expected Elite or SDTS would cease to exist, or at least function, as a business entity."

Mr. Hamilton is patently wrong that the bankruptcy court applied an incorrect standard and only required "some harm." As the court found, Mr. Hamilton knew that his actions would cause "substantial injury" – his own words conjured images of battle, explosion, revolt, or the destruction of a business. Even if he did not predict the exact dollar value of the damage he would cause, Mr. Hamilton knew with substantial certainty that his acts would cause significant damage to the Elite Entities. That is sufficient.

Mr. Hamilton puzzlingly argues that the bankruptcy court erred by deciding the Nondischargeability Judgment on the sole basis of the State Court Judgment and should have consulted a copy of the trial transcript. This argument is frivolous. Mr.

16

Hamilton conveniently forgets the four-day trial that the bankruptcy court conducted on the issue of nondischargeability. The bankruptcy court heard testimony and argument concerning the causes of action asserted in the state court and came to its own conclusions regarding Mr. Hamilton's knowledge and intent; its decision was not based on "the jury verdict alone."

Accordingly, the bankruptcy court's findings met <u>Jercich</u>'s "substantial certainty" standard.

**3.    Mr. Hamilton is not an honest but unfortunate debtor.**

Mr. Hamilton argues that public policy supports the dischargeability of the State Court Judgment.  He contends that exceptions to discharge must be narrowly construed - and thus a finding of "actual intent" is necessary - to "afford debtor[ ] the 'fresh start' anticipated by Congress . . . ."

The fatal flaw in his argument is that he is not an "honest but unfortunate debtor" for whom the bankruptcy discharge was intended.  As <u>Jercich</u> stated, not every debtor is entitled to a fresh start:

> Congress's decision to make the debts listed under § 523(a) nondischargeable reflect[s] a decision by Congress that the fresh start policy is not always paramount.  For example, some of the exceptions to discharge in § 523(a) are based on a corollary of the policy of giving honest debtors a fresh start, which would be to deny dishonest debtors a fresh start.

<u>In re Jercich</u>, 238 F.3d at 1206 (citations and quotation marks omitted); see <u>Grogan v. Garner</u>, 498 U.S. 279, 287 (1991) ("the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor'").  The bankruptcy court found that Mr. Hamilton secretly plotted "with forethought aplenty" to destroy or cripple the Elite Entities.

17

Public policy does not support Mr. Hamilton's case.

We therefore AFFIRM the Nondischargeability Judgment.

**B.    The Elite Entities are entitled to full postjudgment interest at the California rate accruing from the entry of the State Court Judgment.**

The Elite Entities appeal the bankruptcy court's Postjudgment Interest Order, which disallowed interest during Period Three (during the pendency of the adversary proceeding) and awarded postjudgment interest at the federal rate rather than the state rate during Period Four (following entry of the Nondischargeability Judgment).  The bankruptcy court erred when it deprived the Elite Entities of the full benefit of postjudgment interest accruing on the State Court Judgment.  On this issue, we REVERSE and REMAND.

State and federal law both provide for postjudgment interest, but at dramatically different rates.  California Code of Civil Procedure § 685.010 provides that "[i]nterest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied."  Cal. Civ. Proc. Code § 685.010(a).  Under federal law, postjudgment interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding . . . the date of the judgment."  28 U.S.C. § 1961(a).  Due to credit market conditions, the federal rate has been far less than the state rate of ten percent for many years.

As opposed to the statutorily-mandated postjudgment interest, federal courts have discretion to impose prejudgment

18

interest in consideration of the equities of the case. "Awards of pre-judgment interest are governed by considerations of fairness and are awarded when it is necessary to make the wronged party whole." Purcell v. United States, 1 F.3d 932, 943 (9th Cir. 1993) (citation omitted). Prejudgment interest is intended "to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered[.]" Barnard v. Theobald, 721 F.3d 1069, 1078 (9th Cir. 2013) (quoting Schneider v. Cty. of San Diego, 285 F.3d 784, 789 (9th Cir. 2002)). Whether to award prejudgment interest is in "the court's sound discretion[.]" Id. (quoting Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971)).

In the present case, the bankruptcy court properly awarded postjudgment interest at ten percent on the State Court Judgment for Periods One and Two. It did not allow any interest during Period Three and awarded postjudgment interest during Period Four at the federal rate rather than the state rate. This was error.

Section 523 requires bankruptcy courts to determine whether certain "debts" are discharged in bankruptcy. This entails two questions: first, the existence and amount of a debt; and second, whether and to what extent the debt is dischargeable. In this case, the state court had already adjudicated the debt, so the only issue remaining for the bankruptcy court was whether that debt was dischargeable.

The Supreme Court has held that interest is an "integral part" of a nondischargeable debt. Bruning v. United States, 376 U.S. 358, 360 (1964) ("In most situations, interest is considered to be the cost of the use of the amounts owing a creditor and an

19

incentive to prompt repayment and, thus, an integral part of a continuing debt."). Bruning dealt with a tax debt, but the same principle applies to interest on a judgment debt. The Ninth Circuit has stated that "[t]he purpose of postjudgment interest 'is to compensate the successful plaintiff for being deprived of compensation for the loss of time between the ascertainment of the damage and the payment by the defendant.'" United States v. Bell, 602 F.3d 1074, 1083 (9th Cir. 2010), amended, 734 F.3d 1223 (9th Cir. 2013) (quoting Dishman v. UNUM Life Ins. Co. of Am., 269 F.3d 974, 989 (9th Cir. 2001)).

Section 523(a)(6) permits the court to determine whether a debt is dischargeable. It does not permit the court to relieve the debtor of some of the interest that is an integral part of a nondischargeable debt or to adjust the amount of a debt determined by a valid prepetition state court judgment because the bankruptcy court thinks that the state interest rate is too high.

Our precedents indicate that interest on a nondischargeable judgment debt should continue to accrue at the state rate, even after the bankruptcy court determines the nondischargeability of the debt. In Shoen v. Shoen (In re Shoen), BAP No. AZ-96-1884-KJRy (9th Cir. BAP Oct. 22, 1997) (unreported disposition), we stated in dicta that, "If the debts were held to be nondischargeable, then plaintiffs would be entitled to postpetition interest at the state court judgment rate." Shoen v. Shoen (In re Shoen), 176 F.3d 1150, 1159 n.7 (9th Cir. 1999), cert. denied, 528 U.S. 1075 (2000) (appending and adopting the BAP decision). We also stated that "interest at the state's

20

judgment interest rate continues to accrue postpetition on nondischargeable debts. . . . If the debts were to be held in that litigation to be nondischargeable (and the jury's verdict strongly suggests nondischargeability), then the [state's ten-percent] interest that the bankruptcy court determined . . . would have been calculated correctly . . . ." Id. at 1166. We ultimately held that the state court judgment continued to accrue postjudgment interest at the Arizona rate postpetition: "The Ninth Circuit applies applicable state law interest rates absent federal preemption. Several courts have held that the state post-judgment interest rate applies in diversity jurisdiction. . . . Bankruptcy is no different." Id. at 1165. The Ninth Circuit adopted the Panel's decision in whole. Id. at 1152.

We recognize that the decisions on this issue are not uniform. Compare Cty. of Sacramento v. Foross (In re Foross), 242 B.R. 692 (9th Cir. BAP 1999) (holding that postpetition interest accruing on a nondischargeable child support judgment is nondischargeable), and Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee), 218 B.R. 916 (9th Cir. BAP 1998), aff'd, 193 F.3d 1083 (9th Cir. 1999) (holding that postpetition interest on a student loan debt is nondischargeable), with Diversified Funding Grp., LLC v. Hendon (In re Hendon), No. 2:11-AP-01972-EWH, 2014 WL 3966386 (Bankr. D. Ariz. Aug. 13, 2014) (holding that, despite a state court judgment, "because the nondischargeability judgment is a federal judgment for fraud pursuant to § 523(a)(2)(A) and not a breach of contract, it will accrue interest, post-entry, at the federal rate"). We hold that the former line of decisions is

21

correct in cases like this one, where there is a valid prepetition state court judgment. The Nondischargeability Judgment was not a new money judgment under federal law. It simply determined that the State Court Judgment was not dischargeable. As such, the bankruptcy court lacked authority to override the state court's award of interest.

This case is distinguishable from cases where there is no prior state court judgment. In such a case, the bankruptcy court needs to determine both the existence of a debt **and** its dischargeability. The bankruptcy court may then issue a money judgment for the debt, and federal law would govern pre- and postjudgment interest. See, e.g., Zenovic v. Crump (In re Zenovic), BAP No. SC-15-1204-FYJu, 2017 WL 431400 (9th Cir. BAP Jan. 31, 2017) (awarding prejudgment interest where it entered a money judgment on a disputed debt). The bankruptcy court also may (but is not required to) issue a new money judgment where the bankruptcy court decides that the state court's judgment is invalid or that only part of the debt embodied in a state court judgment is dischargeable. See Cottle v. Ariz. Corp. Comm'n (In re Cottle), BAP No. AZ-16-1078-JuFL, 2016 WL 6081030 (9th Cir. BAP Oct. 17, 2016). But neither of those things happened here.[4] The Elite Entities did not request that the bankruptcy court enter a money judgment; they only asked the bankruptcy court to

_____

[4] In their brief, the Debtors quote Cowen v. Kennedy (In re Kennedy), 108 F.3d 1015, 1016 (9th Cir. 1997), and argue that "bankruptcy courts have 'jurisdiction to enter a monetary judgment on a disputed state law claim in the course of making a determination that a debt is nondischargeable.'" This is correct, but the bankruptcy court here properly did not enter a monetary judgment.

22

determine the nondischargeability of the State Court Judgment. Where there is a valid state court money judgment, the bankruptcy court should not issue a new money judgment. See Sasson v. Sokoloff (In re Sasson), 424 F.3d 864, 874 (9th Cir. 2005) (recognizing that, although a bankruptcy court has jurisdiction to enter a new money judgment, "[t]he existence of a prior judgment may introduce some prudential concerns, such as comity, that a bankruptcy court should take into consideration in fashioning relief"); Smith v. Lachter (In re Smith), 242 B.R. 694, 703 (9th Cir. BAP 1999) ("It follows that a separate judgment is not necessary when the claim has already been reduced to judgment by another court of competent jurisdiction."). Accordingly, because the bankruptcy court did not enter a new money judgment, the bankruptcy court should not have eliminated or reduced any of the interest that is an integral part of the State Court Judgment.

Oregon v. Egbo (In re Egbo), 551 B.R. 869 (D. Or. 2016), explains why the bankruptcy court may not change the amount of a valid state court judgment in this context. The state of Oregon obtained a judgment against the debtor for overpayment of unemployment benefits. The judgment bore postjudgment interest at the state rate. The debtor filed for bankruptcy relief, and the state sought a declaratory judgment that its claim was nondischargeable under § 523(a)(2). The bankruptcy court held that the underlying debt was nondischargeable, but then discharged the accruing interest, entered a new money judgment, and held that the nondischargeable debt bore postpetition interest at the federal statutory rate.

23

The state appealed, and the district court vacated the bankruptcy court judgment, holding that the discharge of the postjudgment interest and the issuance of the money judgment were improper. It agreed with the state that "the Bankruptcy Court abused its discretion in entering a federal money judgment in the amount of the nondischarged debt because it deprived Plaintiff of its right to collect the state statutory interest on that debt and interfered with Plaintiff's rights to collect the fraudulently-obtained benefits." 551 B.R. at 875.

Similarly, the bankruptcy court here deprived the Elite Entities of the postjudgment interest that they were due under the State Court Judgment. The determination of nondischargeability did nothing to change their entitlement to postjudgment interest.

Accordingly, the bankruptcy court did not have discretion to deny or adjust the accrual of interest at the state rate after entry of the State Court Judgment.

**CONCLUSION**

The bankruptcy court properly determined that the State Court Judgment was nondischargeable under § 523(a)(6). However, it erred when it declined to award the Elite Entities postjudgment interest at the state rate for the entire period following entry of the State Court Judgment. Accordingly, we AFFIRM the Nondischargeability Judgment but REVERSE and REMAND the Postjudgment Interest Order.

24